.WADHAMS OIL COMPANY, Appellant, vs. TRACY, State Supervisor of Inspectors of Illuminating Oils, Respondent.

*November 17—December 7, 1909.*

*Equity: Jurisdiction: Enjoining enforcement of statute: Constitutional law: Police power: Inspection of oils: Excessive fees: Pleading: Demurrer: Issues of fact: Interstate commerce: State auditor: 'Payments without audit.*

1. It is competent for a court of equity to entertain an action commenced by a person, specially interested, against administrative officers to enjoin them from executing a law, upon the ground of its being unconstitutional, when such person would otherwise be irremediably damaged.

2. The question of equity jurisdiction relates, technically, to power itself, but in the broader sense, when such power should or should not be used.

3. Courts of equity should, · as a rule, decline to exercise jurisdiction, though having it, to enjoin public officers from executing the legislative will as to mere minor features of an enactment, not essential to efficacy of the general and dominant features.

4. Reasonable legislative regulations regarding the adaptability of things placed on sale for human consumption, such as the products of mineral oil, and the proper keeping and handling thereof; for the prevention of fraud, are as well within sovereign police authority, as such regulations for conservation of public safety.

5. A legislative enactment under the police power cannot be condemned as a taxing measure and out of harmony with the constitutional rule of uniformity in that regard, unless the fees. exacted are so clearly excessive, that the legislature could not reasonably have had in contemplation an equivalent for the· mere expense of executing the law.

6. An allegation in a complaint, challenging the legitimacy of an ostensible police regulation on the ground that the fees provided for are so large as to show, clearly, that the object thereof was revenue, does not tender an issue of fact for confession or· denial by the adverse party, when it can be clearly seen from the face of the pleading, in the light of common knowledge and established judicial rules, that the fees are within reason as mere expenses of executing the law.

7. A valid police regulation is not subject to successful attack under· the commerce clause of the national constitution.

8. Disbursements of money from the state treasury must be preceded by an audit by the secretary of state.

9. A legislative enactment, so far as it authorizes payment of money out of the state treasury without constitutional audit, violates sec. 2, art. VI, Const., making the secretary of state *ex officio* state auditor.

[Syllabus by MARSHALL, J.]

APPEAL from orders of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Affirmed.*

Action to enjoin execution of ch. 363, Laws of 1909, upon the ground that it is unconstitutional. A temporary injunction was granted on a verified complaint. There was a demurrer for insufficiency and a motion to vacate the injunction. The former was sustained and the latter granted. The appeal is from both orders.

The complaint, among other things, stated, that plaintiff is a Wisconsin corporation, engaged, in this state, in dealing in products of petroleum, including kerosene oil, gasoline, benzine and naphtha; for illuminating, heating, and power purposes; all of which are subjects of interstate commerce, and are brought into this state to supply trade in which plaintiff is engaged; that defendant and his assistants, as state agents, under pretended authority of the legislative enactment mentioned, will, unless judicially prevented, interfere with plaintiff's business, to its great pecuniary and irremediable detriment; that the act violates art. I, sec. 1, art. I, sec. 13, art. I, sec. 22, art. IV, sec. 18, art. VI, sec. 2, and art. VIII, sec. 1, of the state constitution; also art. I, sec. 8, art. I, sec. 10, of federal constitution, and arts. V and XIV of amendments to the federal constitution; that the inspection fees are exorbitant and the act, generally, is unreasonable and indefinite.

The material interferences authorized by the act are as follows:

(1) All products, mentioned in the act, sold in this state for illuminating or heating purposes, shall be inspected by the state agents, mentioned, under such rules as the chief agent may make, consistent with the provisions of the act.

(2) All packages or inclosures shall be marked so as to evi-

dence the inspection and under such rules as to prevent such evidence being used a second time.

(3) The inspection fees shall be deposited in the state treasury and devoted wholly to expense of the inspection department.

(4) Every product of which petroleum, or any product thereof, forms a constituent part, shall, before being offered for sale in this state for illuminating or heating purposes, be inspected and marked as provided.

(5) Gasoline and like products of petroleum need only be inspected as to specific gravity, the result in each case to be stamped on the package or inclosure, provided, however, that such products, when sold or delivered in bulk from a tank wagon, need only be safeguarded by the wagon having thereon the character of the product delivered therefrom, as indicated in the act.

(6) The standard of test shall be as indicated, and shall be made, promptly, when demanded, and the fee therefor shall be paid by the demandant at ten cents per cask, barrel, package, or sample. In case of the products being in large inclosures there shall be a fee as for barrel lots of fifty gallons.

(7) Illuminating oil shall be tested for temperature at which it will emit a combustible vapor and burn freely, and gasoline and like products of petroleum for their gravity, and if found to satisfy statutory requirements, shall be marked over the signature of the tester, if oil, "approved for illuminating, heating or power purposes;" and if such other products, the specific gravity, specifying the district and date of the test; and a certificate shall be issued by the tester, containing stated specifications. All products, not meeting the required test, shall receive a specified mark of condemnation.

(8) The inspector shall have authority to enter any private premises of any manufacturer, refiner, or vendor of products requiring inspection, and make the proper test and marking of any such product found not to have been so tested and marked,

and examine the books and records of the parties for purposes of discovery.

(9) Any shipment in a tank shall be inspected before unloading, provided the delay shall not be over twenty-four hours, in which case the testing may be done after unloading. In case of inspected oils being placed in stationary tanks, no other inspection shall be necessary, but the tank shall be duly marked by the inspector as provided.

(10) In case of oils, after having been inspected, being shipped out of the state, the inspector's fees shall be returned.

(11) In case of shipment into the state of inspected oils, from points where the standards are the same as here, upon payment of the fees, the inclosures may be duly marked without retesting.

(12) All retailers of gasoline or any similar product shall make deliveries in barrels or small designated inclosures, painted vermilion red, with a specified designation stenciled in English thereon. No such dealer shall make deliveries of kerosene in like manner.

(13) Every vendor or user of gasoline shall keep the same in stenciled inclosures, as aforesaid, and not keep kerosene in like manner; provided, that in case of gasoline and the like, or any product containing the like as a constituent part, of not more than a quart for cleaning purposes, the inclosure may be marked by the name of the product and with the words "unsafe when exposed to heat or fire" painted in bright red ink in letters not less than one fourth of an inch in size.

(14) Penalties shall be as follows:

(a) For selling or offering, personally or otherwise, or in any manner disposing of or attempting to dispose of, any untested and duly stamped and approved product of petroleum for illuminating, heating, or power purposes, or knowingly using or furnishing the same for such use, a fine of from $5 to $500, in addition to liability to the party injured for all damages by him sustained.

(b) For wilfully adulterating illuminating or heating oil, by adding thereto any substance, $50 to $500, or imprisonment in the county jail not more than six months.

(c) For falsely marking an inclosure, personally or otherwise, altering or defacing in any way any of the inspector's markings; or using, in any way, as before, any marked inclosure, without first canceling the inspector's markings, and having a new testing and marking; or offering for sale, or selling, any of the product "representing it to be in any respect other and different in quality or kind than as represented to the person purchasing the same;" or without displaying conspicuously at the place of sale a notice of the "tests both flash and burning, according to the last certificate issued by the deputy inspector making the inspection of the products, as to explosive qualities, and the gravity test of gasoline, provided for in this act," $5 to $500, or imprisonment in the county jail for not more than six months, or both fine and imprisonment.

(d) For disposing, in any way, of any package without first thoroughly canceling, defacing, or removing the inspector's marks, $5 to $500, or imprisonment in the county jail not exceeding six months.

(e) For knowingly offering for sale or using any coal kerosene oil or product for illuminating or heating purposes, which will emit a combustible vapor or burn freely at a temperature less than a specified degree, by a particularly specified standard, or burning in a lamp or vessel or using for illuminating purposes, in any of specified places, any petroleum product which will ignite and burn under a specified temperature by a specified standard, $100 to $1,000, and liability for resulting damages.

(f) For selling or offering for sale any condemned oil, $100 to $1,000, or imprisonment in the county jail not more than six months, or both fine and imprisonment.

(g) For neglect to keep any product, either by seller or user, or to deliver the same as required, $5 to $50, or impris-

onment not to exceed three months, or both fine and imprisonment.

For the appellant there was a brief by *Marshutz & Burnham,* and oral argument by *J. H. Marshutz.*

For the respondent there was a brief by the *Attorney General, A. C. Titus,* assistant, and *J. L. O'Connor,* of counsel, and oral argument by *Mr. O'Connor* and *Mr. Titus.*

MARSHALL, J. The foregoing summary of the act, challenged in this case, shows that it is of no ordinary importance. It interferes, in general and particular, with personal liberty in respect to handling and using many products which have come to be regarded as common necessaries. It does so with a particularity not found in any other legislation of the sort, so far as can be discovered. "Pity 'tis," in the judgment of the writer, if it be true that the common products of mineral oil, which have come to be, in such a multitude of ways, objects of human desire; obtainable for consumption at so low a price as to be within the reach of the humblest, are so highly dangerous; and the individual has so little capacity for protecting himself from fraud and danger, and so little inclination to properly use what knowledge he has in that regard; and is so prone to be ignorant through negligence,—that there is reasonable necessity of putting him under so many and such particular restraints as to injuring himself and of so minutely guarding him against fraud, and of so menacing him with so many threats of punishment. That such assertions of police authority should make extraordinary modes of nullification, like the one invoked here, much more often resorted to than formerly, is a natural result of the new conditions.

Doubtless when an enactment is wholly, or in greater part, unconstitutional, or in such part void that it is clear, the person invoking equitable interference against persons assuming to have authority, as public officers, to enforce it, has no other way of adequately remedying the wrong, the doors of that

ultimate resort should swing open freely.    But it will not do to make of the courts, by equitable interference, a sort of superior upper house to consider and pass, in general, and particular as well, upon legislative enactments, as the court is requested to do in this case.

If an enactment, in its general scope and dominant particulars, is legitimate, as a general rule, equity jurisdiction for an attack upon the law should not be invokable to test mere minor features, but they should be left to their fate as cases arise specially involving them.

Courts of equity have a very large jurisdiction in the sense of power itself.    They have an important secondary jurisdiction to determine when they ought and when they ought not to use that power.    Power is given in very broad field, coupled with a very broad discretion as to when and when not to use it. In the exercise of the secondary power, the court should, as a rule, decline to exercise jurisdiction, though having it, to enjoin public officers from executing the legislative will as to some one or more minor features of a law, not essential to efficiency of its dominant legitimate features.    That measure of reluctance to deal in the field of constitutional nullification, is due to the lawmaking power.    Its indulgence will in no wise militate against a vigorous performance of duty in a situation where there is no judicial right to decline to exercise jurisdiction.    It has been said that, in such situations, to so decline "would be treason to the constitution."    True, but it would be a practice not much, if any, less dangerous, whether it be called treason to the constitution or by a milder name, to exhibit that willingness to defeat the legislative will, involved in judicial nullification of its enactments in advance of there being reasonable necessity for consideration of the matter, as well as unavoidableness, in reason, as to the result.

The manifest purposes of the enactment here are to conserve individual members of society and their property from physical harm and prevent them from dealing fraudulently,

or being victimized by fraudulent practices. Those purposes concern the public welfare in a very broad sense. Hence, the enactment is within the scope of the police power. No question is raised as regards public safety being within such scope, but it is suggested that prevention of and protection from fraudulent practices is not. Counsel is wrong on that point, as ruled by *Meyer v. State,* 134 Wis. 156, 114 N. W. 501, and cases in the federal and state courts, too numerous to mention, sustaining police regulation with reference to butter, oleomargarine, lard, flour, phosphate, grain, tobacco, milk, and many of the common things used in our domestic life, in numerous instances not involving any element detrimental to health; all such regulations being for the purpose, ostensibly at least, in whole or in part, of preventing dealers from expressly or impliedly misrepresenting things offered for sale, and protecting purchasers from being imposed upon as regards the nature of the thing purchased for use, the exact nature of which is not discoverable by ordinary inspection.

That the dangers in general, sought to be guarded against by such laws as the one in question, justify exercise of sovereign police authority, needs no discussion. Laws on the subject exist in nearly, if not, every state in the Union and have uniformly been sustained or treated as constitutional as a matter of course. True, none of them, so far as we can discover, go so far, as regards interference with the liberty of consumers, as the one in question. But there is not much, and, seemingly, no, material difference as regards the general scheme of inspection of products of petroleum before being offered for sale, and official approval of suitableness for use and evidence thereof, between the act in question, those found in other states, and the law here since the enaction of ch. 114, Laws of 1897. The following are but a few of the decisions elsewhere sustaining or recognizing validity of laws containing all the general features we have here, so far as designed to prevent the sale of petroleum products, unsuitable for use:

*Willis v. Standard Oil Co.* 50 Minn. 290, 52 N. W. 652; *Ex parte Robinson,* 28 Tex. App. 511, 13 S. W. 786; *County Court ex rel. Jenks v. Fassett,* 65 Mo. 418; *Hawkins v. L. & N. R. Co.* 145 Ala. 385, 40 South. 293; *Burkhardt's Adm'r v. Striger,* 113 Ky. 111, 67 S. W. 270; *Blaco v. State,* 58 Neb. 557, 78 N. W. 1056; *Hatcher v. Dunn,* 102 Iowa, 411, 71 N. W. 343; *Comm. ex rel. v. Bradley,* 210 Pa. St. 66, 59 Atl. 433; *Louisiana State Board of Health v. Standard Oil Co.* 107 La. 713, 31 South. 1015.

It seems quite obvious that the subject of the act is within the field of police power and the general features satisfy the constitutional requirement of reasonableness. The importance of securing consumers immunity from being imposed upon respecting the quality of petroleum products purchased for use, is obvious, and the impracticability, in general, of their determining for themselves such quality, is likewise obvious. There are common dangers and common beneficial purposes. So all elements are apparent warranting legislative regulation.

It is said the law is a taxing measure and so is contrary to the constitutional provision designed to secure uniformity in that field. That cannot prevail unless the fees are so clearly exorbitant, viewed as mere regulation expenses, that it could not reasonably be claimed the purpose was merely to lay the burden of executing the law upon the property involved. *Wis. Tel. Co. v. Milwaukee,* 126 Wis. 1, 104 N. W. 1009. True, it is alleged in the complaint that the fees are exorbitant; but the question on that subject is not one of fact to be determined by evidence and taken as admitted by the demurrer, as claimed by appellant, merely because a surplus is in fact, or probably will be, collected. If the law, speaking for itself, in the light of common knowledge and adjudications, shows clearly that the fees may reasonably be regarded as mere police expenses, then the allegation to the contrary cannot change the aspect of the matter and make it one to be settled on evidence. It is considered that they can be so re-

garded.   They are about the same as in laws generally on the subject throughout the country, and in no case have similar charges been held exorbitant, so far as we can discover.

The point is made that the act is an interference with interstate commerce.   That is ruled against appellant by the decision that the act is a valid police measure.   *State v. C., M. & St. P. R. Co.* 136 Wis. 407, 117 N. W. 686.

The further point is made that the act violates the constitutional provision making the secretary of state the state auditor, in that sec. 1421*d,* Stats. (Laws of 1909, ch. 363), provides that the salary and expenses of and disbursements by the supervising inspector shall be paid by the state treasurer out of the special fund derived from execution of the law, on vouchers approved by the governor, and that the expenses of deputy inspectors shall be paid out of the special fund upon being approved by the supervisor and governor.

The act, as to disbursement of money, is very unskilfully drawn.   Taking it literally, it contemplates payment of the supervisor's fees without any auditing, strictly so called.   It makes no provision, whatever, for the manner of payment of salaries of deputies, while it contemplates an approval by the governor of such deputies' expenses and an audit by the secretary of state before payment.   It is easily seen that the term "approved" was not used as including the constitutional audit. It is the judgment of the court, that out of the confusion found in the section, no unmistakable command or authorization can be found to pay money out of the state treasury in absence of the constitutional audit.   Therefore, it must be read in harmony with the fundamental requirement that, notwithstanding executive approval, or that of the supervisor, there must be an auditing by the secretary of state before the state treasurer can rightly pay out money intrusted to his custody.   The approval of expenses and salary bills required must be regarded as mere evidence of legitimacy to be considered by the secretary of state in performing his duty.

The foregoing covers all contentions of counsel for appel-

lant which, in any event, could be considered as going to the validity of the whole act. As before indicated, whether in any mere matter of detail, the act be fatally uncertain or unconstitutional, the court should not permit equity jurisdiction to be used in a suit of this sort to determine, and no such matter should be regarded as having been determined in this case either originally or on this appeal.

*By the Court.*—The order is affirmed.