## STATE OF NORTH DAKOTA EX REL. MAURICE KAUFMAN, Appellant, v. J. E. DAVIS, et al., as Members of and Constituting the Board of Administration of the State of North Dakota, Respondent.

(229 N. W. 105.)

192

Opinion filed February 11, 1930.

*McIntyre, Burtness, & Robbins,* for appellant.

194

*James Morris,* Attorney General, and *Harold D. Shaft,* Assistant Attorney General, for respondents.

CHRISTIANSON, J.   This is an action to enjoin the members of the board of administration of the state of North Dakota from granting a permit to, and entering into any arrangement with, the Agricultural College Dormitory Association of Fargo, North Dakota, for the erection of a dormitory on the campus of the Agricultural College of this state, and from entering into any contract or arrangement with said Dormitory Association with regard to the construction, maintenance or leasing of such dormitory.   The complaint alleges that the relator is a citizen and a taxpayer of the state of North Dakota and brings this action in behalf of himself and all other persons similarly situated.   It is alleged that the Agricultural College Dormitory Association of Fargo, North Dakota, has been incorporated under the provisions of chapter 102 of the Laws of North Dakota for 1929.   That said Dormitory Association was organized for the purpose of erecting a dormitory at the Agricultural College at Fargo, North Dakota, and that said board of administration has approved of the organization of said dormitory association and intends to and will, unless restrained by the court, forthwith enter into an agreement with said association for the construction of a dormitory under the provisions of chapter 102 of the Laws of 1929; and that said board of administration will further enter into a contract with said Association for the renting of said dormitory.   It is further alleged that said chapter 102 of the Laws of 1929 is unconstitutional and void for the following reasons:

1.  That it delegates legislative power to the state board of administration in contravention of § 25 of the state constitution.

2.  That the authority given therein to the state board of administration "to lease" a part of the campus of the Agricultural College (and certain other educational institutions of the state) to an institutional

holding association for a period not exceeding fifty years contravenes §§ 159 and 161 of the state Constitution.

3. That the provisions thereof which purport to authorize the conveyance of a portion of the campus and the assignment of the rentals of a dormitory constructed thereon to an institutional holding association contravenes §§ 152 and 159 of the state Constitution.

4. That the act authorizes the board of administration to make a donation of state property, or to loan or give the credit of the state to the institutional holding association in contravention of section 185 of the constitution.

5. That the act violates § 11 of the state Constitution which provides that all laws of a general nature shall have uniform operation.

6. That the act authorizes the board of administration to create an obligation of the state in excess of the debt limit of the state as prescribed in § 182 of the state Constitution.

7. That the provisions of the act which purport to exempt from taxation any dormitory that may be erected and any equipment installed therein by the holding association, and all bonds and other evidences of indebtedness issued by such association, contravene § 20 of the Constitution (which provides that no citizen or class of citizens shall be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens); subdivision 29 of § 69 of the Constitution, (which provides that the legislative assembly shall not pass any local or special laws exempting property from taxation), and § 176 of the Constitution (which provides that taxes shall be uniform upon the same class of property, including franchises within the territorial limits of the authority levying the tax; but that the legislature may by law exempt any or all classes of personal property from taxation and that within the meaning of this section fixtures, buildings or improvements of any character upon land shall be deemed personal property; and that the property of the United States and of the state, county and municipal corporations and property used exclusively for school, religious, charitable or other public purposes shall be exempt from taxation).

There is no allegation and no claim that the board of administration is acting, or is about to act, contrary to the provisions of chapter 102, supra. On the contrary, the basis of the action here is that such board

is proceeding to act and, unless restrained, will act, strictly in conformity with the provisions of that statute; and the claim is that by so acting it will infringe upon certain rights guaranteed to the plaintiff, and others of his class, by the Constitution of this state.

The defendants interposed a general demurrer to the complaint. The demurrer was sustained and the plaintiff has appealed.

The sole questions argued on this appeal relate to the validity of chapter 102, Laws 1929, which reads as follows:

"Sec. 1. Nonprofit sharing corporations to be known as institutional holding associations may be formed in the manner, for the purposes and with the powers, obligations and limitations prescribed by chapter 12 of the Civil Code of the Compiled Laws of 1913; except as herein otherwise provided.

"Sec. 2. Such association shall have power (1) to erect, equip, operate, manage, lease or sell, as herein provided, dormitories and their necessary equipment and appurtenances, to be located either upon the campus of the state university, the agricultural college, any of the normal schools or other state educational institutions, or upon sites in the vicinity of such campus, purchased or otherwise acquired by such association, or as an addition to an existing dormitory at any such educational institution, and to be at all times used and operated solely for educational purposes in connectiton with any of such educational institutions; (2) to borrow money or contract debts for any or all of the aforesaid purposes and to issue bonds or other evidences of indebtedness therefor; (3) to secure the payment thereof by mortgaging and pledging any or all of its property, real or personal, including income.

"Such association shall be subject to the following limitations and restrictions:

"(1) Such dormitories, their equipment and appurtenances, shall only be erected and installed according to plans and specifications therefor first approved by the state board of administration and at a cost for site, building and equipment to be fixed by it within the maximum limit hereinafter provided.

"(2) Such dormitories, their equipment and appurtenances shall at all times be owned, managed, operated and conducted by such association, its successors or assigns, solely for the educational purpose herein

provided in connection with one of such educational institutions and under the control and supervision of said board of administration and under and according to such rules and regulations, including rental charges, as shall be prescribed by it.

"(3) Such association shall be nonprofit sharing; no corporate stock shall be issued and no member shall have or acquire any divisional or other share or interest in any of its property.

"(4) All of the income of such association shall be applied only to the payment of its debts and operating expenses, including necessary repairs and upkeep.

"(5) When all of the debts, against any site, dormitory thereon and equipment, are paid, all of the right, title and interest of such association, its successors or assigns therein shall immediately terminate and the same shall forthwith become the property of and be conveyed to the state.

"(6) Any transfer or encumbrance of the property of such association, except as herein provided, is prohibited and shall be null and void.

"(7) Until further authorization is granted by the legislative assembly of this state, dormitories shall only be elected at such educational institutions as follows:

"One at or near the state university at a cost for site, building and equipment of not to exceed $200,000;

"One at or near the agricultural college at a cost for site, building and equipment of not to exceed $200,000;

"And one at or near each of the normal schools located at Valley City, Mayville, Minot and Dickinson at a cost for site, building and equipment of not to exceed $150,000.

"(8) No dormitory shall be erected upon the campus of any such educational institution until a written permit therefor shall first be granted and issued by the state board of administration to such association. Such permit shall describe the ground to be used, and shall provide that the dormitory to be erected thereon shall be erected, owned and operated by such association, its successors and assigns only as provided for and subject to all the restrictions and limitations imposed by this act. Such association or its successors and assigns shall acquire no right, title or interest in and to such campus site, the dormitory

erected thereon, or the equipment thereof, save and except the right to operate such dormitory solely for the educational purposes, in the manner and upon the terms and conditions herein provided.

"(9) The amount of money borrowed or debts contracted by such association shall not exceed the aggregate cost of the site, dormitory and equipment as fixed by the state board of administration as herein provided and the terms and conditions of such loans or debts shall be fixed and approved by said board but the payment thereof shall not extend over a period of more than fifty years.

"Sec. 3. The articles of incorporation of such association shall contain the following:

"(1) The name of the association. (2) The place, within this state, where its business will be transacted and the name of the educational institution in connection with which it will operate. (3) The term for which it is to exist. (4) That it is formed pursuant to this act to carry out the objects and purposes hereof as provided, limited and restricted herein. (5) The number of its members and the condition of membership and succession therein. (6) The number of its trustees, who may or may not be members, and the names and residences of those who shall serve until their successors are elected and qualified.

"Sec. 4. The board of administration of this state is hereby authorized, directed and empowered (1) to take all necessary and proper action and proceedings to carry out the terms and provisions of this act and to do and perform all of the acts and duties imposed upon said board hereby subject, however, to all the limitations and restrictions imposed herein. (2) To lease from such association, its successors or assigns, the site, dormitory and equipment, or any of them, for a term of not to exceed fifty years to be used and operated by said board or its successor solely for educational purposes in connection with one of such educational institutions. Such lease shall provide for the payment to such association, its successors or assigns, of a net cash annual rental of not to exceed 15 per cent of the cost of such site, dormitory and equipment. Said net cash annual rental shall be payable and paid solely and exclusively out of the income derived from the operation of such dormitory as herein provided, and it is hereby expressly provided that the state shall incur no liability whatever by reason of

the exercise of the authority hereby granted to the said board of administration. (3) To purchase from such association, its successors or assigns, the site, dormitory and equipment, or any of them, at a price not to exceed the cost of such site, dormitory or equipment, to be used and operated by said board or its successor solely for educational purposes in connection with one of such educational institutions. Such purchase price shall be payable in not to exceed fifty years, in annual installments of not to exceed 15 per cent of such purchase price, at a rate of interest of not to exceed 7 per cent per annum, payable semiannually, and shall be payable and paid solely and exclusively out of the income derived from the operation of such dormitory as herein provided, and it is hereby expressly provided that the state shall incur no liability whatever by reason of the exercise of the authority granted to the said board of administration.

"Sec. 5. · Any site, dormitory, its equipment or appurtenances acquired, purchased, erected, installed, owned, operated or maintained by such association, its successors or assigns, as provided herein, and all bonds or other evidence of indebtedness issued by such association, under this act, shall be exempt from taxation.

"Sec. 6. If any part of this act shall be declared invalid, such invalidity shall not be held or deemed to affect or impair the operation of the remainder of said act.

"Sec. 7. All acts or parts of acts, including chapters 257 and 258 of the Laws of 1927, in conflict herewith, are hereby repealed."

Legislation providing for the organization of institutional holding associations, authorizing such associations to construct dormitories at the educational institutions of this state and further authorizing the board of administration to lease and eventually to acquire such dormitories for the state, was first enacted in this state by the legislative assembly in 1927. Laws 1927, chaps. 257, 258. The validity of such legislation was challenged and this court held that it delegated legislative power to the board of administration in contravention of § 25, and authorized the creation of a state debt in contravention of § 182, of the state Constitution. Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156. The correctness of that decision is not questioned on this appeal. On the contrary both plaintiff and respondents concede the soundness

thereof and invoke that decision and the principles announced therein in support of their respective contentions in this case. The appellant contends that the legislation involved here is invalid under the rules announced in Wilder v. Murphy, supra. The respondent, on the other hand, contends that the legislature enacted chapter 102, Laws 1929, in light of the decision in Wilder v. Murphy, supra, and with scrupulous care conformed to the rules announced therein and that, consequently, the present statute is not violative of the constitution.

It is presumed that the lawmakers intend to enact valid and effective legislation and that any and all legislative enactments are enacted within the limits of the powers fixed by the constitution. Every statute must be held to be constitutional unless it is clearly violative of some constitutional provision, and one who alleges a statute to be unconstitutional must be able to point to the constitutional provision that is contravened. State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583; Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, supra.

If fairly possible, a statute must be construed "so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts on that score." United States v. Jin Fuey Moy, 241 U. S. 394, 80 L. ed. 1061, 36 S. Ct. 658, Ann. Cas. 1917D, 854; First Nat. Bank v. Bovey, Shute & Jackson, 49 N. D. 450, 456, 191 N. W. 765; 12 C. J. pp. 787, 788. "In other words, in testing the constitutionality of a statute, the language must receive such construction as will conform it to any constitutional limitation or requirement, if it is susceptible of such interpretation; and the statute and constitutional provisions must be read together and so harmonized as to give effect to both when this can be consistently done. If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional, it is the duty of the court to adopt that construction which, without doing violence to the fair meaning of the language, will render it valid." 12 C. J. 788.

Bearing these principles in mind, we approach the questions presented on this appeal.

1. Does the act in question delegate to the board of administration

legislative power in violation of the constitutional mandate? This question must be answered in the negative.

The fundamental plan of American government, both in state and nation, of dividing governmental power into three branches:—legislative, executive and judicial,—inhibits any of the three departments from abdicating, and surrendering its powers and duties to either or both of the other two; and any legislative enactment bringing about such result contravenes the fundamental law. But, "this is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches insofar as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." J. W. Hampton, Jr. & Co. v. United States, 276 U. S. 394, 406, 72 L. ed. 624, 629, 48 S. Ct. 348.

The statute under consideration here is strikingly different from that involved in Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, supra. Under the act there involved the board of administration was authorized to enter into arrangements with holding associations for the construction of dormitories at any or all of the educational institutions of the state, without any limit as to number of dormitories, or amount to be expended in the construction of each. There was no pretense of a legislative determination that there existed any necessity for a dormitory at any of such institutions and no rule was formulated by the legislature to guide the board of administration in determining whether there was such necessity; but the board of administration was vested with practically unlimited and arbitrary power as regards the construction of dormitories under the act. So far as the provisions of that act were concerned the board of administration might have granted permission to construct a dormitory at one institution and denied the right to construct a dormitory at another institution under an identical state of facts. It might even have granted the right to construct a dormitory at one institution and denied the right to construct a dormitory at another institution even though there was a greater necessity for a dormi-

tory at the latter institution. The act under consideration here is different. Here there is a specific statement as to the number of dormitories to be constructed and a limit of the cost of each dormitory. It is in effect a legislative determination that a necessity exists justifying the construction of any or all of the buildings specified in the act upon the conditions therein prescribed; and the board of administration is granted power to perform, and charged with the corresponding duty of performing, the acts prescribed by the law. In short, the legislation involved in Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, supra, delegated to the board of administration the power to make law, whereas in the statute involved here "the legislature itself has passed upon the expediency of the law, and what it shall be," and the board of administration "is intrusted with no authority or discretion upon these questions." State ex rel. Railroad & Warehouse Commission v. Chicago, M. & St. P. R. Co. 38 Minn. 281, 298, 37 N. W. 782; J. W. Hampton, Jr. & Co. v. United States, 276 U. S. 394, 406, 72 L. ed. 624, 629, 48 S. Ct. 348, supra. See also Enderson v. Hildenbrand, 52 N. D. 533, 204 N. W. 356. By the statute in question here the legislature declared the policy of the law and fixed the legal principles which are to control in all cases, and merely conferred authority or discretion upon the Board of Administration as to the execution of the law. This is not a delegation of legislative power which is inhibited by the Constitution, but the conferring upon an administrative board of power to administer and carry a law into execution. 1 Cooley, Const. Lim. 8th ed. pp. 228–232. For while the legislature may not delegate the power to make the law to any other body or authority and thus escape the duties and responsibilities placed upon it by the constitution, yet, having enacted a law and thus determined for itself the legislative policy and declared a rule of action, the legislature may confer upon a board charged with the duty of carrying such law into execution, the power to direct the details of a plan, the general outlines of which have been prescribed in the statute. J. W. Hampton, Jr. & Co. v. United States, 276 U. S. 394, 407, 72 L. ed. 624, 629, 48 S. Ct. 348; 12 C. J. 847; State ex rel. Wisconsin Inspection Bureau v. Whitman, 196 Wis. 472, 220 N. W. 930. In short, as was said by Chief Justice Marshall: "The maker

of the law may commit something to the discretion of the other departments." Wayman v. Southard, 10 Wheat. 46, 6 L. ed. 263.

The statute under consideration here does not purport to authorize the board of administration to make law. The legislature has made the law. It has assumed the responsibility and discharged the duty placed upon it by the constitution. It has declared the policy. It has prescribed the rule of action. It has merely conferred upon the board of administration certain "authority and discretion to be exercised in the execution of the law, and under and in pursuance of it." This the legislature may do. State ex rel. Railroad & Warehouse Commission v. Chicago, M. & St. P. R. Co. 38 Minn. 281, 298, 37 N. W. 782, supra; J. W. Hampton, Jr. & Co. v. United States, 276 U. S. 394, 406, 72 L. ed. 624, 629, 48 S. Ct. 348, supra.

2. It is next contended that chapter 102, supra, contravenes §§ 159 and 161 of the state Constitution. These sections read as follows:

"Sec. 159. All land, money or other property donated, granted or received from the United States or any other source for a university, school of mines, reform school, agricultural college, deaf and dumb asylum, normal school, or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses thereof."

"Sec. 161. The legislative assembly shall have authority to provide by law for the leasing of lands granted to the state for educational and charitable purposes; but no such law shall authorize the leasing of said lands for a longer period than five years. Said lands shall only be leased for pasturage and meadow purposes and at a public auction after notice as heretofore provided in case of sale; provided that all of said school lands now under cultivation may be leased, at the discretion and under the control of the board of university and school lands, for other

than pasturage and meadow purposes until sold. All rents shall be paid in advance."

In the complaint it is alleged "that the campus of the Agricultural College upon which it is proposed that said dormitory may be erected, as hereinbefore set forth, is located in section 36, township 140, range 49 West, in said Cass county, North Dakota; that said section 36 was, by Act of Congress approved Feb. 22, 1889, and commonly known as the Enabling Act conveyed to the state of North Dakota in trust for the exclusive use and benefit of the common schools of the state of North Dakota, and that by Act of Congress approved September 4th, 1890, consent was duly given to the appropriation by the state of North Dakota of said section 36 for the use of said Agricultural College, and that by chapter 6, Laws 1891, the legislative assembly of this state duly designated and appropriated said section 36 for the use of said Agricultural College as a site for that institution. That thereby said section 36 became and is institutional land belonging to the Agricultural College land grant under grant from the United States, and has become and is subject to the provisions of said §§ 159 and 161 of the state Constitution." And, it is further alleged, that as a consequence chapter 102, purporting to authorize the board of administration to permit an institutional holding association to construct a dormitory on a portion of said tract, upon the conditions set forth in said chapter 102 is violative of §§ 159 and 161 of the Constitution.

In our opinion the contention is not well founded. In the Enabling Act the Federal government granted to the state of North Dakota, upon its admission into the Union, sections numbered 16 and 36 in every township, for the support of the common schools. Enabling Act, § 10. It also granted to the state certain tracts of land for the various educational and charitable institutions. Among the tracts so granted was 40,000 acres for the Agricultural College. Enabling Act, § 17. The people of this state, in the Constitution, accepted these several grants, specifically reserving, however, the right to apply to Congress for modification of such conditions and limitations in case of necessity. Const. § 205. Provision was made for the administration of all lands granted to the state by the Federal government, and an entire article of the Constitution is devoted to this subject. Const. art. 9. It is provided, among

other things, that the superintendent of public instruction, the governor, the attorney general, the secretary of state, and the state auditor shall constitute a board of commissioners known as the board of university and school lands and that this board shall have control of the appraisement, sale, rental and disposal of all school and university lands and shall direct the investments of the funds arising therefrom. Const. § 156. The Constitution further provides that the legislative assembly shall have authority to provide by law for the sale or disposal of all public lands that theretofore had been, or thereafter might be, granted by the United States to the state for purposes other than for the support of the common schools and the various educational and charitable institutions and purposes specified in the Enabling Act and in the Constitution. Const. § 164. In 1890 the United States, by an Act of Congress, granted its consent "to the state of North Dakota to appropriate for the use of the State Agricultural College, as a site for that institution, section thirty-six, township one hundred and forty, range forty-nine west, situate in the county of Cass, in said State, being a portion of the lands granted to said State for the purposes of common schools." Laws 1890, chap. 872, 26 Stat. at L. p. 424. In 1891 the legislative assembly of the state of North Dakota, acting upon such consent of Congress, designated and appropriated said tract of land for use as a site of the Agricultural College and provided that all moneys thereafter appropriated for the erection of buildings and improvements of such college should be expended in the erection of buildings and improvements on such site. Laws 1891, chap. 6. No question is raised as to the validity of such legislation. On the contrary, the contention of the plaintiff is that by virtue of such legislation the said § 36 became in fact, and in law, part of the lands granted to the Agricultural College by the Federal government and, hence, became and is subject to all the provisions of the constitution and the Enabling Act applicable to such lands. This contention is erroneous. By the Act of Congress, approved September 4, 1890, the United States government specifically released this tract of land from the operation of the provisions of the Enabling Act and of the Constitution applicable to the lands granted by it to the state of North Dakota in the Enabling Act. As Long as such tract of land remained part of the grant of the Federal government and subject to the

provisions of the Enabling Act and the constitution, the legislature would have had no authority to appropriate such lands as a site for the Agricultural College. It could have been acquired as such site only by a purchase in the manner provided in the constitution; but the Federal government granted its consent that the tract in question be released from the operations of the grant and that the state of North Dakota might appropriate the same for a site for the Agricultural College. The site acquired in this manner is obviously no more subject to the provisions of the Constitution relating to school and institutional lands than would be a site which had been acquired by purchase from a private owner.

3. It is next contended that chapter 102, supra, violates § 152 of the Constitution. This section reads as follows:

"All colleges, universities and other educational institutions, for the support of which lands have been granted to this state, or which are supported by a public tax, shall remain under the absolute and exclusive control of the state. No money raised for the support of the public schools of the state shall be appropriated to or used for the support of any sectarian school."

The contention is that the conveyance of a portion of the campus of any one of the various educational institutions named in the act, and the assignment of the rentals of any dormitory constructed thereon, will, in effect, transfer the control of such portion of the campus from the state and vest the same in the institutional holding association, its successors or assigns.

The obvious purpose of § 152 of the constitution was to secure to and retain in the state absolute and exclusive control of any and all of the educational institutions receiving support from the land grants or support by public taxation and to prevent any of such institutions from ever being placed under the control of any private person or organization. There can be no doubt that this constitutional provision inhibits the legislature from, in any manner or under any guise whatsoever, transferring the control of any of the state educational institutions to any degree whatsoever to any person or organization; but that such control must remain absolutely and exclusively in the state itself. Does the act in question authorize a transfer or release of the control of the state

over the educational institutions named in the act? May the board of administration, under this act, enter into an arrangement with the institutional holding association which will in any manner interfere with the absolute and exclusive control of the state over the Agricultural College? These questions must be answered in the negative. According to the express provisions of § 2 of the act any dormitory constructed under the provisions thereof is "subject to all the restrictions and limitations imposed by the act;" and the institutional holding association, its successors and assigns, "acquires no right, title or interest in or to such campus site, the dormitory erected thereon, or the equipment thereof, save and except the right to operate such dormitory solely for the educational purposes, in the manner and upon the terms and conditions" provided in the act. And the dormitory, its equipment and appurtenances, must be operated and utilized solely in connection with the educational institution at which it is constructed, and "under the control and supervision of the board of administration and under and according to such rules and regulations, including rental charges, as shall be prescribed by it." The board of administration to whom such control and supervision is given, is the agency created by the state, through which it exercises supervision and control over its higher institutions of learning. Hence, it is apparent that the state has not surrendered, but has retained, control to the same degree as though the dormitory was constructed by the state itself, with moneys appropriated out of the state treasury.

But it is said that under the terms of the act the institutional holding association, under its permit from the board of administration, will acquire the right to occupy the property and construct a dormitory thereon and may continue to hold such property for a period of fifty years. That the institutional holding association has power to mortgage or lease the dormitory and that, hence (especially in case default occurs in the payments of the mortgage, and foreclosure is had) the control of the state over the dormitory and the portion of the campus occupied thereby, will or may be interfered with for the period of time that has been agreed upon between the board of administration and the holding association. The contention thus advanced does not appear to us to have any substantial support in the provisions of the statute.

The intention of the legislature, as evidenced by the act, is that the state at no time shall lose control over the property. It is always under the control and supervision of the administrative board created by the state to exercise supervision and control over its higher institutions of learning. And this power to supervise and control continues without regard to whether the holding association continues to own the dormitory or the dormitory passes into the hands of the successors or assigns of the holding association, either by sale or through foreclosure proceedings. According to the express provisions of the act all parties who acquire any interest in the property, acquire it subject to the right of the state through its administrative board to exercise full control and supervision over the same. Furthermore, there is no contract between the state and the institutional holding association and the latter acquires no contractual right to occupy the site granted on the campus for any particular length of time. According to the provisions of the statute the holding association merely obtains a permit to erect a dormitory upon the site designated by the board of administration, and such association does not, nor do its successors or assigns, acquire any "right, title or interest in and to such campus site, the dormitory erected thereon or the equipment thereof, save and except the right to operate such dormitory solely for the educational purposes, in the manner and upon the terms and conditions" provided in the act. When the debts incident to the construction, maintenance and equipment of the dormitory have been paid, the right, title and interest of the association, its successors and assigns, immediately terminate and the dormitory and its equipment become the property of the state. Until title so passes to the state, the dormitory and the equipment thereof remain personal property and the holding association, its successors and assigns, are mere licensees of the campus site; and if at any time it becomes necessary or desirable for the state to do so it may terminate the license which has been granted and require the dormitory to be removed from the campus.

4. It is next contended that the act violates § 185 of the Constitution which provides that the state shall not loan or give its credit or make donations to or in aid of any individual, association or corporation except for the reasonable support of the poor. The contention

that chapter 102, supra, contravenes this constitutional provision is predicated largely, if not wholly, upon the theory that the legislature by authorizing the board of administration to permit an institutional holding association to erect a dormitory upon a portion of the campus of an educational institution, in effect, donates the site for such dormitory, or at least loans it to the holding association and that to the extent of the value of such site a donation is made, or the state's credit is given or loaned.

The purpose of § 185 of the Constitution was primarily to inhibit the state from indulging in the practice, which theretofore had been in vogue in many other states, of making donations, or giving or loaning the state's credit, to companies promising to construct railways or other internal improvements. The language of the section is sweeping and all-inclusive. But in this case the state makes no donation, nor does it loan or give its credit. Under the express provisions of the act there is no obligation on the part of the state to pay one cent of any moneys that are to be expended, or of debts that may be contracted, in the construction, maintenance and equipment of a dormitory. Any person contracting with the institutional holding association acquires no contract rights whatsoever against the state. Even in a case where the state board of administration agrees to lease the dormitory it does not incur any liability or indebtedness on the part of the state, as the statute expressly provides that the payments agreed upon are to be payable, and must be paid, solely and exclusively out of the income derived from the operation of the dormitory; and that the state incurs "no liability whatever by reason of the exercise of the authority granted to the board of administration" under the provisions of the statute. Chapter 102, § 4, supra.

It is true the statute permits a portion of the campus to be occupied by a dormitory erected by the institutional holding association; but the dormitory may be operated only for the benefit and use of the educational institution. In short, it may be used only to facilitate the work of that institution. The legislature has determined that there is such an existent need for a dormitory as to justify the construction thereof upon the terms and conditions prescribed in the act. The legislature must also have determined that it would be for the benefit of the Agri-

cultural College (and the other educational institutions specified in the act) to have dormitories constructed upon the terms and conditions prescribed, and that consequently it is to the advantage of the state and the various educational institutions named in the act that this be done. If there is a necessity for the construction of such buildings to facilitate the work of the particular educational institutions at which they are authorized to be constructed then there is obviously ample consideration for the use of the sites on which dormitories may be constructed. This being so, there is, of course, no donation.

5. It is next contended that the act violates § 11 of the Constitution which provides: "All laws of a general nature shall have a uniform operation." In support of this contention it is argued that the statute is limited in its operation to the educational institutions specified in the act; that certain other higher institutions of learning are excluded, and it seems to be inferred that in order to comply with the provisions of § 11 of the Constitution the statute should have been made applicable to all of the state's institutions of higher learning. This argument is not well founded. It might with equal force be argued that the legislature might not appropriate moneys to construct a dormitory or any other needed building at one of the educational institutions of the state unless it also makes provision for the construction of a similar building at all the other institutions. In dealing with the various institutions of learning it is, of course, necessary for the legislature to determine the need of each and to provide for that need within the limits prescribed by the Constitution and the means reasonably available for that purpose. Obviously, the legislature cannot provide by general law for a program of development and the construction of buildings and other improvements at the various educational and charitable institutions of the state. The need of each institution must be considered by itself and provision made accordingly.

6. It is next contended that the act authorizes the board of administration to create an obligation on the part of the state in excess of the debt limit prescribed by § 182 of the Constitution. This contention cannot be sustained. Under the terms of the act there is no possible way in which any obligation can be incurred on the part of the state. All debts incident to the construction and equipment of a dormitory

will be the debts of the institutional holding association. And the act specifically provides that in case the board of administration leases and agrees to purchase the dormitory and equipment from the institutional holding association that the rental and purchase price "shall be payable and paid solely and exclusively out of the income derived from the operation of such dormitory . . . and . . . that the state shall incur no liability whatever by reason of the exercise of the authority" granted to the board of administration. Here again the statute in this case is strikingly different from that involved in Wilder v. Murphy, supra. Under the statute involved in that case property of the state was to be pledged and rendered subject to mortgage given by the institutional holding association. That is not the situation under the statute in question here. Here no property of the state is pledged, and no obligation can be incurred on the part of the state, either directly or indirectly, on account of any dormitory that may be constructed, equipped or maintained under the provisions of the act.

7. It is next contended that the provision of chapter 102, supra, which purports to exempt from taxation the property of an institutional holding association and all bonds or other evidences of indebtedness issued by it, is violative of § 20, subdivision 29, § 69 and § 176 of the Constitution. The case before us does not require or permit a determination of the question thus raised. That question does not involve any existing rights which may properly form the subject of judicial determination here. Texas v. Interstate Commerce Commission, 258 U. S. 158, 66 L. ed. 531, 42 S. Ct. 261. It is merely anticipatory and calls for the decision of an abstract question of law. There has been no attempt to subject any property of, or bonds or evidences of indebtedness issued by, an institutional holding association to taxation. Nor has there been any attempt to exempt such property from taxation. In fact, there is no such property, bonds or evidences of indebtedness, in existence, and any question as to the validity of the provisions exempting bonds or evidences of indebtedness from taxation may never arise, as the institutional holding association in question here, and others that may be organized, may never issue any bonds or evidences of indebtedness. We are wholly agreed that the question whether the property of an institutional holding association and the bonds or other evi-

dences of indebtedness issued by it are, or may be, exempted from taxation is not one which may be properly considered or determined in this case.

"While it is the duty of the judiciary, when required in the regular course of judicial proceedings, to declare void any act which violates the Constitution, it will not do to make of the courts 'a sort of superior upper house to consider and pass, in general and particular as well, upon legislative enactments.' Wadhams Oil Co. v. Tracy, 141 Wis. 150, 123 N. W. 785, 18 Ann. Cas. 779. The power to revoke or repeal a statute is not judicial in its character, and the courts ought not to pass on the question of constitutionality of a statute abstractly, but only as it applies and is sought to be enforced in the government of a particular case before the court." McCoy v. Davis, 38 N. D. 328, 332, 164 N. W. 951.

"A constitutional question does not arise merely because it is raised and a decision thereon sought. A party who assails the validity of a statute on constitutional grounds must show that he is prejudiced by the alleged unconstitutional provision, and that a decision on the constitutional question is necessary in order to protect him in the enjoyment of the rights guaranteed to him by the Constitution. 'Courts will not assume to pass upon constitutional questions unless properly before them, and the constitutionality of a statute will not be considered and determined by the courts as a hypothetical question. It is only when a decision on its validity is necessary to the determination of the cause that the same will be made, and not then at the instance of a stranger, but only on the complaint of those with the requisite interest. These principles have been recognized by the Supreme Court of the United States. That tribunal has announced that it rigidly adheres to the rule never to anticipate a question of constitutional law in advance of the necessity of deciding it.' . . ." Olson v. Ross, 39 N. D. 372, 382, 167 N. W. 385.

"It is only where rights, in themselves appropriate subjects of judicial cognizance, are being, or about to be, affected prejudicially by the application or enforcement of a statute, that its validity may be called in question by a suitor, and determined by an exertion of the

214

judicial power." Texas v. Interstate Commerce Commission, 258 U. S. 158, 162, 66 L. ed. 531, 537, 42 S. Ct. 261.

It follows from what has been said that chapter 102, Laws 1929, is not vulnerable to attack on any of the grounds made against it in this action, and that the trial court was correct in holding that the complaint did not state facts sufficient to constitute a cause of action. Order affirmed.

BURKE, Ch. J., and BIRDZELL, NUESSLE, and BURR, JJ., concur.