**TRINITY MEDICAL CENTER and Medcenter One, not for profit corporation, Plaintiffs,**

v.

**NORTH DAKOTA BOARD OF NURS-ING; Jan Schauer, Kay Hovland, Yvonne Hamilton, Paulette Voegele, James Shearer, Alice Kotaska, Alvilda Skurdal, Karen Robideau, and Bonnie Bieber, constituting all of the members of the North Dakota Board of Nursing, Defendants.**

Civ. No. 11257.

Supreme Court of North Dakota.

Jan. 8, 1987.

Bosard, McCutcheon & Rau, Minot, for plaintiff Trinity Medical Center; argued by Gary Lee.

Lundberg, Nodland, Lucas & Schulz, Bismarck, for plaintiff Medcenter One.

Calvin N. Rolfson, Sp. Asst. Atty. Gen. (argued), Bismarck, and Larry Kraft, Grand Forks, for defendants.

Zuger & Bucklin, Bismarck, amicus curiae for State Nurses Association.

Vedder, Price, Kaufman, & Kammholz, Chicago, Ill., amicus curiae for Nat. Council of State Boards of Nursing, Inc.

ERICKSTAD, Chief Justice.

The issues under consideration were certified to us pursuant to Rule 47.1 of the North Dakota Rules of Appellate Procedure by the Honorable Bert L. Wilson, Judge of the District Court of Northwest Judicial District. We affirm. The certified questions and answers by the district court are:

"1. Whether [or not] the authority given by the State Legislature to the North Dakota Board of Nursing through Section 43–12.1–08(6), N.D.C.C., constitutes a standardless delegation of legislative authority and [if it does] is therefore in violation of Article III, Section 1, of the North Dakota Constitution. [Answer: "No."]

"2. Whether [or not] the Nursing Board usurped purely legislative powers from the North Dakota Legislature in promulgating Article 54–03.1, N.D.A.C. [Answer: "No."]"

The trial court's findings of fact are as follows:

"I.

"Defendants are the duly appointed members of the North Dakota Board of Nursing.

"II.

"Pursuant to Chapter 43–12.1, N.D.C.C., the Nursing Board met and held public hearings. Subsequent to said hearings, and in accordance with Chapter 28–32, N.D.C.C., the Board promulgated various rules and regulations establishing the educational requirements for nurses in North Dakota and establishing criteria for approval of nursing education programs in North Dakota.

"III.

"The challenged rules appear in Article 54–03.1, N.D.A.C., and became effective on March 1, 1986.

"IV.

"These rules apply to the schools of nursing operated by Plaintiffs. Application of these rules has injured, and will continue to injure the schools of nursing operated by the Plaintiffs. Plaintiffs have therefore initiated suit challenging the constitutional validity of those rules. Plaintiffs make no claim that the Board lacked authority to promulgate rules, or that these rules were not enacted in conformity and accordance with Chapter 28–32, N.D.C.C. Plaintiffs' claims therefore present no material factual issues, but do present material issues of law which are vital and of great moment, and the answers to which will completely dispose of the Plaintiffs' claims."

We shall hereafter refer to the plaintiffs as the Hospitals and to the defendants as the Board. On March 19, 1986, the Hospitals obtained from the district court of Williams County an *ex parte* order temporarily restraining the Board from enforcing administrative rules adopted by the Board including 54–03.1–11–04, N.D.A.C., giving the Board authority to order a discontinuation of nursing programs that did not meet its requirements, and an order to show cause why the restraining order should not continue pending final determination of the merits of the complaint. The complaint sought a judgment declaring Section 43–12.1–08(6), N.D.C.C., unconstitutional and

an order first temporarily staying and ultimately permanently enjoining the enforcement of certain administrative rules adopted by the Board. The Board denied the essential allegations of the complaint and urged that it be dismissed. On April 24, 1986, the Hospitals served by mail a notice of motion and a motion to certify questions of law to our Court.

On May 21, 1986, the district court granted the motion for certification and halted all proceedings.

We must first determine whether or not the questions of law are appropriately before us. *State v. Lebus,* 339 N.W.2d 564, 566 (N.D.1983); *Merchant v. Richland County Water Management District, Board of Commissioners,* 270 N.W.2d 801, 804 (N.D.1978).

The certification of questions of law to the Supreme Court is authorized by Chapter 32–24, N.D.C.C. Section 32–24–01 provides:

"Where any cause is at issue, civil or criminal, in any district court or county court in this state and the issue of the same will depend principally or wholly on the construction of the law applicable thereto, and such construction or interpretation is in doubt and vital, or of great moment in the cause, the judge of any such court, on the application of the attorney for the plaintiff or defendant in a civil cause, and upon the application of the attorneys for the plaintiff and defendant in a criminal cause, may halt all proceedings until such question shall have been certified to the supreme court and by it determined."

■ The decision to submit certified questions of law is within the discretion of the trial court and we may refuse to consider certified questions that are frivolous, or are merely interlocutory, or are of insufficient importance to settle the issues in the case. Section 32–24–02, N.D.C.C.; *City of Grand Forks v. Grand Forks County,* 139 N.W.2d 242, 248 (N.D.1965).

In *City of Grand Forks,* 139 N.W.2d at 248, we said:

"The trial court must first exercise its discretion in determining that the questions to be certified are doubtful and it must be made to appear that the case in which they arise will depend wholly or principally upon the construction of law applicable to the questions certified.

"The questions of law must be clearly and distinctly stated. They should not involve questions of fact or mixed law and fact. Advisory opinions to the trial court are not contemplated by the statute." [Citations omitted.]

We additionally said in *Lebus,* 339 N.W.2d at 566, that "before a certified question will be considered by this Court, the result of the action must depend wholly, or at least principally, upon the construction of the law as it will be determined by the answers to the question or questions certified, regardless of whether answered in the negative or affirmative."

The Board argues that many of the facts contained in the Hospitals' complaint are in dispute. It specifically denies the finding of fact in the certification that "[a]pplication of these rules has injured, and will continue to injure the schools of nursing operated by the [Hospitals]." The Board argues, notwithstanding its plea that we decide the certified questions, that if the Hospitals have not been harmed by the application of either Section 43–12.1–08(6), N.D.C.C., or Article 54–03.1, N.D.A.C., the Hospitals would not have standing.

■ Rule 47.1(b)(2), N.D.R.App.P., permits the certifying court to transmit "with the certification order any parts of the record and other documents it deems necessary in answering the certified questions." In this case we have no memorandum opinion; however, it is apparent that the court relied upon the affidavits in the appendix to determine that the Hospitals have been injured and will continue to be injured by the rules in Article 54–03.1, N.D.

A.C., promulgated by the Board pursuant to Section 43–12.1–08(6). We agree that the standing is sufficient. See *State v. Carpenter*, 301 N.W.2d 106, 107 (N.D. 1980). The two-fold test of standing is that the plaintiff must have suffered some threatened or actual injury resulting from the putatively illegal action, and the asserted harm must not be a generalized grievance shared by all or a large class of citizens.

The Board also contends that a reversal of the trial court's answers to the certified questions would not dispose of the action because unresolved issues raised in the Board's answer would remain. The Board alleges as an affirmative defense that the Hospitals are estopped from asserting their claims in equity either by the unclean hands doctrine or by their abuse of the process of law. For this contention the Board relies upon our decision in *State v. Vogel*, 343 N.W.2d 773 (N.D.1984). In *Vogel* we concluded that we would not answer certified questions unless our determination would resolve all remaining issues in the case. We commented:

"An additional barrier to our consideration of this question is the admission by both parties that, even had judgment not been entered, a determination by this court would not resolve all remaining issues in the case. In particular, Vogel advanced the defense of 'selective enforcement' in the county court. He further asserts that if this court were to answer the question in the negative he would continue to pursue that defense. Such would be his right because the issue was never resolved by the county court. We cannot, therefore, answer the question certified because, as was conceded, the issues in this case are not wholly dependent on our resolution of the particular question presented." 343 N.W.2d at 775.

In *Vogel* it was admitted that answering the certified questions would not resolve all remaining issues in the case. Here the district court found that the Hospitals' claims "present no material factual issues, but do present material issues of law which are vital and of great moment, and the answers to which will completely dispose of the [Hospitals'] claims." Because the decision to submit certified questions is within the sound discretion of the district judge we will not dismiss the questions unless presented with sufficient contrary evidence that the district court's findings of fact are in error or unless our analysis of the issues indicates that our answers will not principally resolve all remaining issues in the case.

As we believe that the answers to the certified questions will principally resolve the remaining issues in the case, we will proceed to answer the questions.

The first certified question is whether or not the authority given by the Legislature to the Board of Nursing in Section 43–12.1–08(6) [1] is a standardless delegation of legislative authority in violation of Article III, Section I, of the North Dakota Constitution. [2]

The Hospitals argue that the Board of Nursing has been given unlimited power by

1. Section 43–12.1–08(6), N.D.C.C.:
*"Powers and duties of the board.*—The board shall:
\* \* \* \* \* \*
6 Establish standards for all nursing education programs or acknowledge programs accredited by national nursing accrediting agencies."

2. Article III, Section 1 of the North Dakota Constitution reads:
"*Section 1.* While the legislative power of this state shall be vested in a legislative assembly consisting of a senate and a house of representatives, the people reserve the power to propose and enact laws by the initiative, including the call for a constitutional convention; to approve or reject legislative Acts, or parts thereof, by the referendum; to propose and adopt constitutional amendments by the initiative; and to recall certain elected officials. This article is self-executing and all of its provisions are mandatory. Laws may be enacted to facilitate and safeguard, but not to hamper, restrict, or impair these powers."

the Legislature pursuant to Section 43–12.-1–08(6) to establish all standards and educational requirements for entry into the nursing programs.

While apparently only a few delegations by Congress to administrative agencies have been held unconstitutional by the United States Supreme Court, state application of the nondelegation doctrine has been more vigorous. 1 K.C. Davis, *Administrative Law Treatise* § 3:14 (2d ed. 1978) (*See Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), and *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)). Professor Davis comments that the state nondelegation doctrine "is both diminishing and changing." He notes that "[d]uring the first half of the twentieth century, holdings of state courts that delegations were invalid for lack of standards or lack of sufficient standards were very numerous." He asserts, however, that "[s]uch holdings are sparse in current reports." Tracing the beginning of the nondelegation doctrine he says:

> "An early remark had enormous influence for almost a century: 'The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law.' *Cincinnati, W. & Z.R. Co.,* 1 Ohio St. 77, 88 (1852), quoted with approval in *Field v. Clark,* 143 U.S. 649, 693–694 [12 S.Ct. 495, 504–05, 36 L.Ed. 294] (1892)." 1 K.C. Davis, *Administrative Law Treatise* § 3:14, *supra.*

In 1904, this Court followed the *Cincinnati, W. & Z.R. Co./Field* standard and validated the statute granting boards of county commissioners the discretion to institute judicial proceedings to enforce payment of real property taxes in *Picton v. Cass County,* 13 N.D. 242, 100 N.W. 711 (1904). This Court in *Picton* explained the distinction between the delegation of power to make the law and conferring authority as to its execution as follows:

> " 'The Legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside of the halls of legislation.' " 100 N.W. at 713 (quoting *Locke's* Appeal, 72 Pa. 491, 13 Am.Rep. 716).

Two years earlier than *Picton* this Court in *Glaspell v. City of Jamestown,* 11 N.D. 86, 88 N.W. 1023 (1902), held that a statute authorizing district courts to exclude territory from city limits to be an unconstitutional delegation of legislative power. In *Glaspell* this Court reasoned that granting discretion to restrict city limits was not ascertaining fact, a judicial function, but rather was a determination of public policy, a legislative function.[3]

In *State ex rel. Rusk v. Budge,* 14 N.D. 532, 105 N.W. 724 (1905), this Court determined that the statute authorizing the Capitol Commission the discretion to set the cost in reconstructing the capitol building and the construction of a Governor's residence was an invalid delegation of purely legislative powers. It reasoned that because the statute did not specify a spend-

---

**3.** *Glaspell* was subsequently followed by this Court in *City of Carrington v. Foster County,* 166 N.W.2d 377 (N.D.1969). In *City of Carrington* we concluded that certain statutes authorizing district courts to hear and rule on the merits of annexation petitions prepared by municipal authorities to be an unconstitutional delegation of legislative power to the judiciary, as well as an unconstitutional violation of the separation of powers principle. *Glaspell* and *City of Carrington* consider the question of the contitutionality of the delegation of legislative authority to the judiciary as distinguished from the delegation of power to an administrative agency.

ing limitation the Commission had unlimited discretion to fix the cost of each building and concluded that the cost of each building was a substantive matter of legislative discretion not to be delegated by the Legislature to an administrative agency. This Court explained the distinction between legislative and administrative duties as follows:

"It is claimed that the Legislature has fully performed this general duty by the provisions of section 1 of chapter 166, wherein it is enacted what the duties of the board of capitol commissioners shall be in the following words: 'And whose duty it shall be to remodel and reconstruct upon its present site the capitol building of the state of North Dakota, at Bismarck, and erect a suitable residence for the Governor on the lots now owned by the state according to the provisions of this act.' The law contains no directions as to how much shall be expended for each of said buildings. That is left entirely to the commissioners. Nor does the law definitely specify when these buildings shall be completed, nor when the duties of the commissioners shall end. It cannot be reasonably disputed that the Legislature has power to delegate to a board the work of superintending the erection of public buildings. The Legislature cannot act upon every detail arising in the course of the erection of public buildings, or in preparation therefor. This power must necessarily be delegated to some person or body. These duties are deemed executive, although they often involve discretion, and some of these could properly have been specifically provided for by legislative enactment. Duties that relate to acceptance of plans and specifications, making contracts, selecting materials, and other similar ones relate to the execution of the law enacted by the Legislature, and are deemed administrative. *State v.*

McGraw, 13 Wash. 311, 43 Pac. 176; *Fleckten v. Lamberton,* 69 Minn. 187, 72 N.W. 65; *Territory v. Scott,* 3 Dak. 357, 20 N.W. 401." 105 N.W. at 727.[4]

In *Wilder v. Murphy,* 56 N.D. 436, 218 N.W. 156 (1928), this Court invalidated the statute that authorized the Board of Administration to enter into arrangements with holding associations for the construction of dormitories at state educational institutions. In concluding that the statute was an unconstitutional delegation of legislative power to an administrative board, this Court said:

"In the instant case no real limitation is imposed by the act beyond which the board may not go in its expenditures. The board itself fixes the amount of the income (by fixing the charges to the occupants) from the buildings to be erected and from other dormitories belonging to the particular institutions. All of this income may be resorted to and used by the board. It is stipulated in the instant case that there are now upon the campus of the State University three dormitories, and that the income from these dormitories amounts to $10,000 annually. If further dormitories are erected, this income will be appreciably increased. The board is empowered to pledge and pay all of such income through a period of fifty years. It is true that the statute says that the net income of all the dormitories may be paid as rental for the use of the building to be erected, but it likewise provides that this 'rental' shall be sufficient to pay the interest upon any bonds that may be issued to procure the moneys with which the building is to be built, and also to pay the principal upon the amortization plan or otherwise. So, though the statute designates this payment as 'rental,' it contemplates that it shall be more than rental. Not only is the board authorized to thus pledge and

---

**4.** *Budge* was subsequently followed in early North Dakota Supreme Court cases. *See State ex rel. Miller v. Taylor,* 27 N.D. 77, 145 N.W. 425 (1913) and *State ex rel. City of Fargo v. Wetz,* 40 N.D. 299, 168 N.W. 835 (1918).

pay the income from these dormitories, but it is left to the board to fix such income in that the board determines the rate that shall be charged for the use of the dormitories. And the only limit placed upon this rate is the economic limit imposed by the law of supply and demand. In other words, the board is permitted to charge all that the traffic will bear. Clearly this limitation of practicability is in fact no limitation, and thus no limitation is fixed by the act upon the amount which the board may raise and expend. The power to appropriate money is purely a legislative power. Section 186, Constitution; *Holmes v. Olcott,* 96 Or. 33, 189 P. 202. The act in fact delegates this power and thus is subject to the plaintiff's challenge." 218 N.W. at 159.

We think it significant notwithstanding the *Wilder* Court's holding that it quoted with apparent approval this statement of the United States Supreme Court in *Mutual Film Corporation v. Industrial Commission:*

"236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann.Cas. 1916C, 296:

" 'While administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. Undoubtedly the Legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws, and in an effort to detail and particularize, they would miss sufficiency both in provision and execution.' " *Wilder,* 218 N.W. at 158.

In *State ex rel Kaufman v. Davis,* 59 N.D. 191, 229 N.W. 105 (1930), this Court upheld the validity of a statute similar in scope to the challenged statute in *Wilder v. Murphy.* In *Davis* the Court in distinguishing *Wilder* said:

"The act under consideration here is different. Here there is a specific statement as to the number of dormitories to be constructed and a limit of the cost of each dormitory. It is in effect a legislative determination that a necessity exists justifying the construction of any or all of the buildings specified in the act upon the conditions therein prescribed; and the board of administration is granted power to perform, and charged with the corresponding duty of performing, the acts prescribed by the law. In short, the legislation involved in *Wilder v. Murphy, supra,* delegated to the board of administration the power to make law; whereas, in the statute involved here, 'the legislature itself has passed upon the expediency of the law, and what it shall be,' and the board of administration 'is intrusted with no authority or discretion upon these questions.' *State ex rel. Railroad & Warehouse Comm. v. Chicago, Milwaukee & St. Paul Railway Co.,* 38 Minn. 281, 298, 37 N.W. 782; *Hampton, Jr., & Co. v. United States, supra* [276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624]." 229 N.W. at 109.

In *Davis* it was concluded:

"This is not a delegation of legislative power which is inhibited by the Constitution, but the conferring upon an administrative board of power to administer and carry a law into execution. 1 Cooley's Const. Limitations (8th Ed.) pp. 228–232. For, while the Legislature may not delegate the power to make the law to any other body or authority, and thus escape the duties and responsibilities placed upon it by the Constitution, yet, having enacted a law, and thus determined for itself the legislative policy and declared a rule of action, the Legislature may confer upon a board, charged with the duty of carrying such law into execution, the power to direct the details of a plan, the general outlines of which have been pre-

scribed in the statute. *Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 407, 48 S.Ct. 348 [351], 72 L.Ed. 624, 629; 12 C.J. 847; *State v. Whitman,* 196 Wis. 472, 220 N.W. [929] 930." *Id.*

In *Nord v. Guy,* 141 N.W.2d 395 (N.D. 1966), this Court found the statute authorizing the Board of Higher Education to provide education facilities at state educational institutions without specifying where such facilities were to be constructed or the cost of construction to be an unconstitutional delegation of legislative power. In *Nord* this Court considered the contrast between *Wilder v. Murphy, supra,* and *Kaufman v. Davis, supra,* in its constitutional analysis and determined that the challenged statute fell "into the same objectionable pattern that was held to be unconstitutional in *Wilder v. Murphy.*" *Nord,* 141 N.W.2d at 404.

*Nord* and *Wilder* were subsequently followed by this Court in *Montana-Dakota Utilities Co. v. Johanneson,* 153 N.W.2d 414 (N.D.1967). In *Montana-Dakota Utilities* the Court invalidated part of the Territorial Integrity Law as an unconstitutional delegation of legislative authority. Finding an absence of adequate safeguards or guidelines to protect against possible arbitrary action, this Court said:

"As this court pointed out in *Nord v. Guy, supra,* and in the earlier case of *Wilder v. Murphy, supra,* we must be guided by certain rules which control in our consideration of the challenge by the public utilities to the constitutionality of the Act. The Legislature must declare the policy of the law and must definitely fix the legal principles which are to control the action taken. If the Public Service Commission is permitted only to ascertain the facts and conditions to which the policy, as declared by the Leg-

islature, is to apply, the Act will be held constitutional. But where the Act attempts to delegate, to either the Public Service Commission or the co-operative, powers and functions which determine such policy and which fix the principles which are to control, the Act is unconstitutional. *Fink v. Cole* and *Fink v. Jockey Club,* 302 N.Y. 216, 97 N.E.2d 873." 153 N.W.2d at 421.

On the other hand, in *Ralston Purina Company v. Hagemeister,* 188 N.W.2d 405 (N.D.1971), this Court upheld provisions of the Poultry Improvement Act authorizing the Poultry Improvement Board to reduce license fees if the Board determined that the fees were excessive where the Legislature fixed the maximum fees to be charged. This Court determined that the Act did not give the Poultry Improvement Board uncontrolled discretion in fixing fees, but only conferred on the Board authority to execute the provisions of the law.[5] This was the explanation:

"The Legislature enacted this statute to promote the welfare of and stimulate interest in the poultry industry. It fixed the maximum license fees to be paid by poultry buyers, processors, and packers, by hatcheries, by baby-chick and turkey-poult jobbers and salesmen, by record-of-performance breeders, and by poultry-feed manufacturers, wholesalers, and retailers. It obviously would be almost impossible for the Legislature to determine the exact amount of fees necessary to supervise and regulate the various businesses mentioned, and so the Legislature gave to the Poultry Improvement Board the power, if it determines that the charges and fees fixed by the Legislature in the law are excessive or unduly burdensome, or that a lesser schedule of fees will produce all the income neces-

5. This finding distinguished *Scott v. Donnelly,* 133 N.W.2d 418 (N.D.1965). In *Scott* this Court held that the power vested in the North Dakota Potato Development Commission to fix fees and to determine the area in which the fees apply was an unconstitutional delegation of legislative power. In *Scott* we reasoned that this power provided the Commission with uncontrolled discretion in determining these matters and as such violated Section 175 of the North Dakota Constitution.

sary for carrying on the work of the Board, to reduce such fees accordingly. The law does not delegate to the Board the power to enact any legislation as to the maximum fees to be paid, or as to whom the provisions of the statute shall apply. All that the Legislature has attempted to do is to confer upon the Poultry Improvement Board the power to ascertain, *under the law enacted by the Legislature,* some fact upon which the law, by its own terms, makes its action depend." 188 N.W.2d at 411. [Emphasis in original.]

This Court summarized its reasoning as follows:

"2. While purely legislative powers cannot be delegated, the Legislature may authorize others to do certain things and to exercise certain powers which are not exclusively legislative and which the Legislature itself might do but cannot because of the detailed nature of the things to be done.

"3. If the law sets forth reasonably clear guidelines which will enable the administrative board or commission to ascertain facts, so that the law takes effect on such facts under its own provisions and not according to the discretion of the administrative board, the power delegated is not legislative.

"4. In our complex society, the trend of decisions is to hold that the vesting in other bodies of some powers ordinarily exercised by the Legislature is not unconstitutional so long as the Legislature itself fixes the guidelines within which such powers will be exercised. Where such guidelines are established, the commission or board is not given uncontrolled discretion in determining these matters." 188 N.W.2d at 407 (Syllabus by the Court).

In *Southern Valley Grain Dealers v. Bd. of Cty. Comr's,* 257 N.W.2d 425 (N.D. 1977), this Court upheld the constitutionality of a statute authorizing the State Board of Equalization or appropriate boards of city or county commissioners to grant a five-year tax exemption to new industries pursuant to Chapter 40–57.1, N.D.C.C. Sections 40–57.1–01 and 40–57.1–03, N.D. C.C., provide that the boards, in determining whether tax exemptions should be granted,

" '... shall give due weight to their impact and effect upon existing industry and business to the end that an unfair advantage shall not be given to new enterprises which is to the substantial detriment of existing enterprises' [Sec. 40–57.1–01, N.D.C.C.];"

and may grant an exemption

" '... if it finds that such exemption will not result in unfair tax reduction competition between political subdivisions ... [and] is in the best interest of the people of North Dakota, ...' [Sec. 40–57.1–03, N.D.C.C.]."

In validating this broad delegation of authority, we said:

"While these statements are general, we believe they are no more so than other authorizations which have been upheld. *See Davis, Administrative Law of the Seventies,* § 2.04.

"We must recognize as a practical matter that the Legislature must not violate Section 69 of the North Dakota Constitution, prohibiting special acts, and it cannot take the time to evaluate each application for tax exemption. It has the right to delegate that evaluation to the two boards which deal most often and most directly with taxes on real estate and may be expected to have expertise in the area: the board of county (or city) commissioners in each case and the State Board of Equalization. Delegation to expert boards and bureaus is common, necessary, and desirable in many cases.

"We must also recognize, as the Court of Appeals of Kentucky did, in *Commonwealth of Kentucky v. Associated Industries of Kentucky,* 370 S.W.2d 584 (Ky.1963), that even though there are three branches of government, govern-

ment cannot be divided into 'watertight compartments,' and administrative agencies often perform acts which are partly legislative, partly executive, and partly judicial, 'only softened by a quasi,' as Justice Holmes put it, in his dissent, in *Springer v. Government of Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928)." 257 N.W.2d at 435.

In *County of Stutsman v. State Historical Soc.*, 371 N.W.2d 321 (N.D.1985), our most recent case exploring the limits of legislative delegation, we held that the statute authorizing the State Historical Board to place sites of historical value on the historical registry was not an unconstitutional delegation of legislative power. In *County of Stutsman* we found the term "historical value" when considered within the context and policy of Chapter 55–10, N.D.C.C., to be "a reasonably clear guideline and a sufficiently definite standard to pass constitutional muster." We said that such a standard was sufficient "to advise ordinary and reasonable people as to its meaning and to limit the Board's discretionary power to place sites on the Registry." 371 N.W.2d at 328–29.

Professor Davis explains that the modern trend of the state nondelegation doctrine is to consider safeguards along with or instead of standards. *Davis, supra* at § 3:14. He suggests that "[t]he criterion for determining the validity of a delegation should be the totality of the protection against arbitrariness, not just the one strand having to do with statutory standards." He asserts that "what is needed is not simply a substitution of a requirement of safeguards for a requirement of standards but a consideration of both safeguards and standards in order to determine whether the total protection against arbitrary power is adequate." *Davis, supra* at § 3:15.

*Ralston Purina Co., Southern Valley Grain Dealers*, and *County of Stutsman* are indicative of the modern trend. We believe that both standards and safeguards are necessary to assure that administrative agencies are not given uncontrolled discretion. Although the standards set forth in the Nurse Practices Act, Ch. 43–12.1, N.D. C.C., are broad, they are sufficient when considered with the safeguards. In this respect we agree with the amicus brief filed by the National Council of State Boards of Nursing, Inc., to the effect that procedural safeguards exist which prevent the Board from engaging in arbitrary rule making:

"First, the Act itself requires the Board in establishing standards and approving programs to conduct public hearings before adopting any rules and regulations or standards and to 'involve active participation of all appropriate state education agencies and representatives of public and proprietary institutions which are involved in and responsible for funding or operation of such programs.' N.D.Cent. Code § 43–12.1–08(18), (19). Secondly, the North Dakota Administrative Agencies Practice Act sets out comprehensive procedural safeguards to check any arbitrary decision-making the Board might attempt. N.D.Cent. Code Chap. 28–32. It requires that all interested parties be afforded the opportunity to submit written or oral exceptions to the rules promulgated, that all rules promulgated be submitted to the Attorney General for opinions as to legality, and that any party aggrieved by an agency's decision may petition for rehearing, as well as a host of other safeguards."

The Minnesota Supreme Court illustrated a mix of standards and safeguards in *Minnesota Energy & Economic Development Authority v. Printy*, 351 N.W.2d 319 (Minn.1984). In that case, the Court held that the State Legislature did not unconstitutionally delegate its authority to the Energy Economic Development Authority to issue energy development loans following the statutory mandate of fostering cooperation between the government and private sector to assure an available and reliable

supply of energy where the statute provided for close legislative monitoring of the Authority's operations. In upholding the constitutionality of the Energy and Economic Development Act after distinguishing the Montana case of *Douglas v. Judge,* 174 Mont. 32, 568 P.2d 530, 535 (1977), which holds to contrary, the Minnesota Court concluded:

"Regardless whether or not our Supreme Court would follow the *Douglas* decision in an identical case, it is clear to this Court that in a complex area it is necessary and appropriate for the legislature to delegate in broad and general terms.

"Nor are the Act's provisions relating to energy loan insurance and energy development loans defective for lack of adequate statutory standards. The legislative policy with respect to both of these energy-related programs is set forth in Minn.Stat. § 116J.921 (Supp.1983). The plaintiff's legislative mandate is to foster cooperation between government and the private sector of the economy to assure that Minnesota has available a reliable, economic supply of energy. Legislative intent with respect to what constitutes conservation, alternative energy resources, renewable energy resources, and energy recovery is specifically set forth in the definitional provisions of Minn.Stat. § 116J.922 (Supp.1983). The Legislature further provided that plaintiff's powers be broadly interpreted 'to facilitate innovative leadership in all areas of energy, including policy setting, goal definition, strategy planning, conservation, development of renewable and alternative energy resources, energy recovery, and monitoring.' Minn.Stat.

§ 116J.923, subd. 3 (Supp.1983). In administering its energy programs the Authority, is specifically directed by the Act to focus on the 'job creation' and to accommodate the needs of low income families and persons. Minn.Stat. § 116J.923, subd. 5 (1983). Significantly, the Act also provides for close legislative monitoring of plaintiff's operations in the energy area by mandating planning, including planning as to appropriate reserve and guarantee fund levels, and by mandating annual reporting to the Legislature. Minn.Stat. § 116J.923, subd. 9 (Supp.1983). Each of the Authority's energy programs is subject to the foregoing guidelines, standards and legislative supervision. In addition to these general standards, specific standards apply to the energy loan insurance program. The Act expressly authorizes plaintiff to establish eligibility requirements for insurance by rule, Minn.Stat. § 116J.924, subd. 3(b) (Supp.1983), and these standards are now in effect. 4 MCAR §§ 14.071–14.080.

"It is acceptable for the Legislature to allow plaintiff to promulgate reasonable eligibility requirements by rule, rather than fixing them by statutory provision. These requirements are the kind of 'details' which are properly delegated to an administrative agency, particularly in a complex and fast-changing area where the purpose of the legislative program is to foster cooperation between government and lenders in the promotion of energy conservation. Similarly, the Legislature has established adequate standards in connection with the making of energy development loans." 351 N.W.2d at 350–51.[6] *See* also *Adams v. North Carolina Dept. of Natural and Eco-*

---

**6.** "The modern view of the delegation doctrine is that clear legislative standards are no longer required to avoid an unconstitutional delegation where the rights of the public are protected against an abuse of administrative power by (1) adequate 'procedural safeguards' or (2) adequate 'administrative standards,' which have been established by the agency pursuant to a grant of rulemaking authority.

1 *K. Davis Administrative Law Treatise* §§ 3.14–3.15 (2d ed. 1978 & Supp.1982). *See, State ex rel. Douglas v. Nebraska Mortgage Fund,* 204 Neb. 445, 283 N.W.2d 12 (1979) (modern tendency is to permit delegation in light of complexity of economic and governmental conditions)." *351 N.W.2d 319 at 350,* footnote 13.

*nomic Resources*, 295 N.C. 683, 249 S.E.2d 402 (1978).

Section 43–12.1–01, N.D.C.C., asserts that the practice of nursing "is directly related to the public welfare" and "is subject to regulation and control in the public interest to assure that competent practitioners and high quality standards are available." It stresses that "[i]t is essential to govern qualifications for licensure with requirements for the maintenance of high standards." It concludes with the admonition that the chapter is to "be liberally construed in order to carry out its purposes and objectives."

Section 43–12.1–08(18), N.D.C.C., directs the Board to "[p]romulgate and adopt such rules and regulations pursuant to Chapter 28–32 as are necessary to carry out the provisions of this chapter."

Section 28–32–02 authorizes an administrative agency to adopt, amend or repeal "reasonable rules in conformity with the provisions of any statute administered or enforced by the agency, and to prescribe methods and procedure required in connection therewith." [7]

Section 43–12.1–08(6) provides that the Board shall "[e]stablish standards for all nursing education programs...." This is the section that is alleged to be unconstitutional. It must be read in conjunction with subsections 7 through 16 of Section 43–12.-1–08, N.D.C.C. [8]

Section 43–12.1–02 divides the field of nursing into two parts. Subsection three defines the practice of nursing as a licensed practical nurse. [9] Subsection five

7. "*28–32–02. Rulemaking power of agency—Notice—Attorney general's opinion.* Every administrative agency is authorized to adopt, and from time to time to amend or repeal, reasonable rules in conformity with the provisions of any statute administered or enforced by the agency, and to prescribe methods and procedure required in connection therewith. Prior to the adoption, amendment, or repeal of any rule, the agency shall adopt a procedure whereby all interested persons are afforded reasonable opportunity to submit data, views, or arguments, orally or in writing. In case of substantive rules, opportunity for oral hearing must be granted if requested. The agency shall consider fully all written and oral submissions respecting the proposed rule. Every rule proposed by any administrative agency shall be submitted to the attorney general for an opinion as to its legality before final adoption, and the attorney general shall promptly furnish each such opinion. The attorney general may not approve any rule as to legality when the rule merely repeats or paraphrases the text of the statute purported to be implemented by the rule. The attorney general may not approve any rule as to legality where the rule exceeds the statutory authority of the agency or is written in a manner that is not concise or easily understandable. The attorney general may suggest any revision or rewording of a rule to meet objections as to legality."

8. "*43–12.1–08. Powers and duties of the board.* —The board shall:

&ast; &ast; &ast; &ast; &ast; &ast;

7. Conduct surveys as necessary of nursing education programs required to meet board standards.

8. Approve such nursing education programs which meet board standards.
9. Conduct a licensing examination at least once a year for entry into practice as a registered nurse or licensed practical nurse.
10. License candidates who qualify by examination as registered nurses or licensed practical nurses.
11. Maintain a permanent register of the names of all persons to whom licenses to practice as a registered nurse or a licensed practical nurse are issued. Such register shall be open to public inspection.
12. Renew licenses periodically.
13. Promulgate rules and regulations pursuant to chapter 28–32 for renewal of licenses after an absence of five years from the active practice of nursing.
14. Discipline licensees as necessary.
15. Establish standards for quality of practice for registered nurses and licensed practical nurses after consultation with the North Dakota state nurses association, the North Dakota licensed practical nurses association, and other professional nursing groups.
16. Establish standards for quality of practice for registered nurses and licensed practical nurses functioning in specialized roles after consultation with the North Dakota state nurses association, the North Dakota licensed practical nurses association, and other recognized nursing specialty groups."

9. Section 43–12.1–02(3), N.D.C.C., reads:

"3. The 'practice of nursing as a licensed practical nurse' is defined as the performance of those services, requiring the basic knowledge of biological science and technical skills,

defines the practice of nursing as a registered nurse.[10]

Section 43–12.1–10 provides for an examination to be given by the Board upon proof of completion of an "appropriate nursing education program" and upon recommendation "by the nursing faculty of the completed nursing education program." [11]

■ These statutes do provide standards albeit broad in nature. Because of the nature of the subject matter, however, they, of necessity, must be quite broad. True, the Legislature could have specifically set the standards but that would have lessened the flexibility inherent in the Board's rule-making authority and might have increased the hardship, by a possibly premature requirement, upon those subjected to it without the opportunity for further hearing available through the Administrative Agencies Practice Act, Chapter 28–32, N.D.C.C. It follows that Section 43–12.1–08(6) is not unconstitutional as unlawful delegation of legislative power.

■ The next certified question is whether or not the Board has usurped legislative power in passing administrative rules pursuant to Section 43–12.1–08(6), N.D.C.C. The Board, through its rule-making power in determining who may recommend a person to take the test, has not usurped legislative power.

It requires no leap of logic to equate high standards of nursing in the interest of public health with a requirement that those who train nurses be accredited pursuant to appropriate authority and that applicants for licensure in nursing receive an appropriate degree before being permitted to write an examination for licensure.

The Board has the authority pursuant to Section 43–12.1–08(6) to define "school" as

commonly performed by a licensed practical nurse under the direction of a registered nurse, licensed physician, or dentist for the purpose of:
a. The maintenance of health and prevention of illness.
b. The observation and nursing care of persons experiencing changes in their health processes.
c. Administering prescribed · medications and treatments.
d. Teaching and evaluating health practices of patients.
e. Providing specialized nursing care when such service is authorized by the board through its rules and regulations and delegated by a registered nurse, physician, or dentist, to a licensed practical nurse who has had additional preparation or experience."

10. Section 43–12.1–02(5), N.D.C.C., reads:
"5. The 'practice of nursing as a registered nurse' is defined as the performance of acts requiring the specialized knowledge, judgment, and skill based on principles of the biological, physical, behavioral, and social sciences in:
a. The maintenance of health and prevention of illness.
b. Diagnosing human responses to actual or potential health problems.
c. Providing supportive and restorative care, health counseling and teaching, case finding and referral of persons who are ill, injured, or experiencing changes in the normal health processes.

d. Administration, teaching, supervision, delegation, and evaluation of health and nursing practices.
e. Collaboration in the implementation of the total health care regimen and execution of a medical regimen as prescribed or authorized by a licensed physician or dentist and the performance of such additional acts which are recognized by the nursing profession, in connection with the medical profession, as proper to be performed by registered nurses who have had additional specialized preparation and are authorized by the board through its rules and regulations to perform such acts."

11. "43–12.1–10. License by examination. —Any person who desires to practice as a registered nurse or licensed practical nurse in this state shall be required to write and pass the licensing examination given by the board. Such persons shall file a certified written application for license by examination at least thirty days before the examination accompanied by the prescribed fee and submit satisfactory proof of having the following qualifications:
1. Satisfactory completion of the appropriate nursing education program in another country or the appropriate nursing education program approved by a board of nursing in the United States.
2. Recommended to the board by the nursing faculty of the completed nursing education program."

"a post secondary educational institution offering transferrable academic credit" excluding diploma nursing schools from operating nursing programs unless they offer transferrable academic credits. *See* Section 54–03.1–01–05(5), N.D.A.C.[12] That this marks a tightening of the rules as they relate to the licensing of nurses does not make the rule violative of the state or United States Constitutions. The Board has the authority pursuant to Section 43–12.1–08(6) to direct that only associate and baccalaureate degree graduates may sit for practical and registered nursing license examinations, respectively. *See* Sections 54–03.1–06–02(6) and 54–03.1–07–02(6), N.D.A.C.[13] This appears to be a reasonable requirement in an area of standard setting.

Although this may appear to be a departure from some of this Court's earlier decisions, it comports with our more recent applications of the doctrine of non-delegability of legislative powers as stated and applied in *County of Stutsman v. State Historical Soc.*, 371 N.W.2d 321 (N.D. 1985), and the trend of cases nationwide necessitated by the complexities of the society in which we live.

We take cognizance of the fact that medical science in general is advancing at a very rapid rate, and, accordingly, knowledge that members of the nursing profession must have to render quality nursing service in matters of life and death is also likewise increasing. This justifies the del-

egation of standard setting in Section 43–12.1–08, N.D.C.C., under the guidelines prescribed by the other statutes alluded to earlier herein. It would be difficult if not impossible for the Legislature to establish more definitive standards with the flexibility necessary to keep abreast of the developments in medical science. In light of the developments in educational standards it is obvious that the Legislature contemplated that in setting standards the board could require what it has done through the passage of the administrative rules also referred to herein.

In this light, we find that Section 43–12.1–08(6), N.D.C.C., is not violative of Article III, Section 1, of the North Dakota Constitution nor is Article 54–03.1, N.D.A.C., a usurpation of that statute or that provision of the State Constitution.

It is clear that what authority the Legislature has delegated in this area it can also retract. It is not as though the Legislature had delegated unlimited authority to an agency to perform acts which would be wastefully prohibitive, if not impossible, to undo. The authority to retract in circumstances like this is a safeguarding influence on the Board to enact rules only within the statutory guidelines and to exercise reasonable restraint.

For the reasons set forth herein, and respectful of the presumption that all statutes enacted by the Legislature are consti-

---

**12.** Section 54–03.1–01–05(5), N.D.A.C., reads:
"5. 'School' means a postsecondary educational institution offering transferable academic credit which includes a program in nursing."

**13.** Section 43–12.1–08(6), N.D.C.C., reads:
"The board shall:
\* \* \* \* \* \*
6. Establish standards for all nursing education programs or acknowledge programs accredited by national nursing accrediting agencies."
Section 54–03.1–06–02(6), N.D.A.C., reads:
"*Curriculum requirements.* The curriculum includes courses from the following academic disciplines and meets requirements for an associate degree with a major in nursing:

\* \* \* \* \* \*
"6. Courses to meet the school's general requirements for the associate degree."
Section 54–03.1–07–02(6), N.D.A.C., reads:
"*Curriculum requirements.* The curriculum includes courses from the following academic disciplines and meets requirements for a baccalaureate degree with an upper division major in nursing:
\* \* \* \* \* \*
"6. General requirements concepts which will provide the student with an understanding of the principles of education and learning, management and technology, and courses to meet requirements for a baccalaureate degree."

tutional, and recognizing that this presumption is conclusive unless it is clearly shown that the statute contravenes the state or federal constitution, *Richter v. Jones*, 378 N.W.2d 209, 211 (N.D.1985), we affirm the trial court in its answers to both certified questions.

. GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.