NORTH DAKOTA COUNCIL OF SCHOOL ADMINISTRATORS, Fargo Public School District, Harvey Public School District No. 38 and Central Valley Public School District No. 003, Petitioners, Appellants and Cross–Appellees,

v.

The Honorable George SINNER, Governor, State of North Dakota, Dick Rayl, Director, Office of Management and Budget, Respondents, Appellees and Cross–Appellants,

and

Dr. Wayne Sanstead, Superintendent, Public Instruction, Respondent and Appellee.

Civ. No. 890301.

Supreme Court of North Dakota.

July 3, 1990.

---

William D. Schmidt (argued), Wheeler Wolf, Bismarck, for petitioners, appellants and cross-appellees.

Patricia M. Moen (argued), Asst. Atty. Gen., Bismarck, for respondents, appellees and cross-appellants the Honorable George Sinner and Dick Rayl.

Robert E. Lane (argued), Asst. Atty. Gen., N.D. Dept. of Transp., Bismarck, for respondent and appellee Dr. Wayne Sanstead.

OPINION

ERICKSTAD, Chief Justice.

The North Dakota Council of School Administrators [the Council], the Fargo Public School District, Harvey Public School District No. 38, and Central Valley Public School District No. 003 [the School Districts] appeal from a district court order dismissing their application for a writ of mandamus. We affirm.

The 1987 Legislature appropriated funds based upon revenue forecasts projecting approximately $1.055 billion in general fund revenues for the 1987–1989 biennium. When a July 1988 revenue projection predicted revenues for the biennium of only $1.017 billion, Richard Rayl, the Director of the Office of Management and Budget, implemented the provisions of Section 54–44.-1–12, N.D.C.C., to uniformly reduce all general fund agencies' budgets by two percent through an allotment process. As a result, the Department of Public Instruction [DPI] was required to reduce its expenditures by $7,661,458. Foundation aid grants to local school districts were consequently reduced by $6,331,711 for the biennium.

Throughout the remainder of the biennium, the revenue forecasts showed increasingly higher revenue projections. The November 1988 forecast estimated revenues at $1.022 billion; the March 1989 forecast was $1.039 billion; the April 1989 forecast, which included the effects of the sales tax rate increase passed by the 1989 Legislature, was $1.040 billion.

In June 1989 it became apparent that actual revenues for the biennium would in fact exceed the $1.055 billion projection

upon which the 1987 Legislature had based its appropriations. On June 20, 1989, the North Dakota Association of School Administrators requested in writing that funds be restored to allow the full foundation aid payments authorized by the 1987 Legislature. On June 22, 1989, Wayne Sanstead, the Superintendent of Public Instruction, made a similar request. On June 29, 1989, Rayl informed all state agencies that the two percent reductions would not be restored. Actual revenues for the 1987–1989 biennium eventually totaled over $1.072 billion, some $17 million more than the projections upon which the 1987–1989 appropriations were based.

The Council commenced this action against Rayl, Sanstead, and Governor George Sinner, seeking a writ of mandamus to compel restoration of allotted funds to allow foundation aid payments in the amount appropriated by the 1987 Legislature. The School Districts were joined as petitioners a few days later, before any responsive pleading had been served. The district court entered an order dismissing the action of September 6, 1989. The Council and the School Districts have appealed, and Sinner and Rayl have cross-appealed.

The following issues are dispositive of the appeals:

1) Do the Council and School Districts have standing?

2) Is the appeal moot?

3) Did the trial court err in refusing to issue a writ of mandamus requiring the respondents to restore allotted funds to DPI for disbursement as foundation aid payments?

4) Is Section 54–44.1–12, N.D.C.C., an unconstitutional delegation of legislative authority?

1. Respondent Sanstead is represented by separate counsel and has generally supported the petitioners' attempt to compel restoration of funds to DPI.

2. A question was raised at oral argument concerning application of what might be denoted as a "quasi statute of limitations" defense. The Council commenced this action in June 1989, prior to the end of the 1987–1989 biennium. The School Districts were joined as parties on July 14, 1989, after the biennium had ended.

## I. STANDING

A party is entitled to have a court decide the merits of a dispute only after demonstrating that he has standing to litigate the issues placed before the court. *State v. Tibor*, 373 N.W.2d 877, 879 (N.D.1985). Sinner and Rayl[1] assert that the Council lacks standing to seek a writ of mandamus to compel restoration of funds and that the School Districts have standing only to assert their own individual claims, not those of other similarly situated districts.

Sinner and Rayl concede that the School Districts have standing to assert their individual claims. We therefore will reach the merits as to those individual claims and, because we conclude that the petitioners were not entitled to a writ of mandamus, we find it unnecessary to resolve the disputed issues of standing.

The Council's arguments on appeal are identical to those of the individual School Districts. The petitioning parties were all represented by the same counsel, filed a single brief, and made one oral argument. No purpose would be served by determining whether the Council has standing when resolution of that issue would have no effect on the outcome of this appeal.

Similarly, it is unnecessary to determine whether the School Districts have standing to assert the claims of other similarly situated school districts. That issue relates solely to the scope of the relief which could be granted if the petitioners were entitled to a writ of mandamus. Because we conclude that the district court did not err in refusing to issue the writ, the scope of relief available if a writ were issued is immaterial.[2]

There is some question whether or not the action could have been commenced after the expiration of the biennium, and whether or not the joinder of the School Districts "relates back" to the time the action was commenced by the Council. These issues were not raised in the pleadings, in the arguments or briefs to the district court, or in the appellate briefs. An issue not presented to the trial court will not be considered for the first time on appeal. *Hanson v. Williams County*, 452 N.W.2d 313, 315 (N.D. 1990); *cf. State v. Hersch*, 445 N.W.2d 626 (N.D.

## II. MOOTNESS

■ Sinner and Rayl assert that this appeal is moot because they cannot now be ordered to transfer funds to meet appropriations for the 1987–1989 biennium. Specifically, they argue that the appropriation has lapsed and been cancelled as of July 30, 1989, pursuant to Section 54–44.1–11, N.D.C.C. They further assert that the funds have been transferred to the Budget Stabilization Fund, and that Section 54–27.2–03, N.D.C.C., restricts expenditure of those funds to appropriations for the current biennium.

Assuming that these assertions are correct, we nevertheless decline to dismiss the appeal as moot. We will not dismiss an appeal as moot where the matter in controversy is one of great public interest and involves the authority and power of public officials, or where the matter is capable of repetition, yet evading review. *See, e.g., Rolette Education Association v. Rolette Public School District No. 29*, 427 N.W.2d 812, 814 (N.D.1988); *State v. Liberty National Bank and Trust Co.*, 427 N.W.2d 307, 308 (N.D.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988).

All of the relevant factors in this case militate against dismissal of the appeal as moot. The petitioners challenge the authority of state officials to impinge upon the appropriation power of the legislative assembly, and assert that the statute in question constitutes an unconstitutional delegation of legislative power to the executive branch. Millions of dollars in state aid to local school districts hang in the balance. These are clearly issues of great public concern involving the authority and power of public officials.

Additionally, the inherent nature of the appropriation and allotment process set forth in Chapter 54–44.1, N.D.C.C., virtually assures repetition without a meaningful opportunity for judicial review. Any time an allotment is made reducing agency budgets, the actual availability of additional revenues will not be discerned until very late in the biennium. There is a strong probability that the biennium will end, the thirty-day period specified in Section 54–44.1–11, N.D.C.C., will run, and the appropriation will lapse and be cancelled before a legal challenge in the courts can "work its way through the trial and appellate court processes." *See State v. Liberty National Bank, supra*, 427 N.W.2d at 309. This is a classic example of an issue which is capable of repetition, yet evading review.

We decline to dismiss the appeal as moot.

## III. MANDAMUS

The School Districts assert that the trial court erred in refusing to issue a writ of mandamus directing Sinner, Rayl, and Sanstead to restore the allotted funds to DPI and disburse these funds to local school districts as foundation aid.

Issuance of writs of mandamus is governed by Section 32–34–01, N.D.C.C.:

> *"By and to whom writ of mandamus issued.*—The writ of mandamus may be issued by the supreme and district courts to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station. . . ."

■ The party seeking a writ of mandamus bears the burden of demonstrating that he has a clear legal right to the performance of the particular act sought to be compelled by the writ. *E.g., Old Broadway Corp. v. Backes*, 450 N.W.2d 734, 736 (N.D.1990); *Bradley v. Beach Public School District No. 3*, 427 N.W.2d 352 (N.D.1988); *Lund v. North Dakota State Highway Department*, 403 N.W.2d 25, 26 (N.D.1987). The officer must have a nondiscretionary duty to perform the act:

> " 'Mandamus will not lie . . . unless the plaintiff's or relator's legal right to the performance of the particular act sought to be compelled by the writ is clear and complete. . . . Neither will it lie where there is some other plain, speedy and

1989) (in a criminal case the statute of limitations is a jurisdictional fact and is therefore noticeable for first time on appeal).

adequate remedy in the ordinary course of law.... To be enforceable by mandamus, the duty must be one clearly and peremptorily enjoined by law. The law must not only authorize the act, but it must require it to be done....' [Citations omitted.]"

*Mini Mart, Inc. v. City of Minot*, 347 N.W.2d 131, 136 (N.D.1984) (quoting *Midland Produce Co. v. City of Minot*, 70 N.D. 256, 257–258, 294 N.W. 192, 193 (1940)).

 Issuance of the writ is left to the sound discretion of the trial court, and a denial of the writ will not be overturned on appeal unless the court has abused its discretion. *Old Broadway Corp. v. Backes, supra,* 450 N.W.2d at 736; *McCallum v. City Commissioners of City of Bismarck,* 393 N.W.2d 263, 264 (N.D.1986). A court abuses its discretion when it acts in an arbitrary, unconscionable, or unreasonable manner. *Old Broadway Corp. v. Backes, supra,* 450 N.W.2d at 736.

 The School Districts assert that Section 54–44.1–12, N.D.C.C., imposes a specific, statutory duty upon the director of the budget to restore, or "unallot," funds if projected revenues rise after an allotment has been made. That statute provides:

"*Control over rate of expenditures.* The director of the budget shall exercise continual control over the execution of the budget affecting the departments and agencies of state government, with the exception of the legislative and judicial branches. Execution means the analysis and approval of all commitments for conformity with the program provided in the budget, frequent comparison of actual revenues and budget estimates, and on the basis of these analyses and comparisons control the rate of expenditures through a system of allotments. The allotment must be made by specific fund and all departments and agencies that receive moneys from that fund must be allotted on a uniform percentage basis. Before an allotment is made which will reduce the amount of funds which can be disbursed pursuant to an appropriation or before an allotment disallow-

ing a specific expenditure is made, the director shall find one or more of the following circumstances to exist:

"1. The moneys and estimated revenues in a specific fund from which the appropriation is made are insufficient to meet all legislative appropriations from the fund.

"2. The payment or the obligation incurred is not authorized by law.

"3. The expenditure or obligation is contrary to legislative intent as recorded in any reliable legislative records, documents, or other reliable evidence available.

"4. Circumstances or availability of facts not previously known or foreseen by the legislative assembly which make possible the accomplishment of the purpose of the appropriation at a lesser amount than that appropriated."

The statute specifically provides that the director of the budget may make an allotment which reduces available funds for an appropriation if one or more of the four guidelines is met. It does not, however, provide an express or implicit duty upon the director to "unallot" funds if the reason for the allotment subsequently abates. Nor do the School Districts direct our attention to legislative history which suggests that the Legislature intended to impose such a duty upon the director. Had the Legislature meant to require restoration of allotted funds if and when revenue projections improved, it could have explicitly done so.

The 1989 Legislative Assembly was aware of the two percent budget reductions that had occurred through the allotment process in August 1988. The March 1989 revenue projections predicted revenues of $1.039 billion. Nevertheless, the Legislature took no action to restore the allotted funds, through supplemental appropriations or otherwise, and based its 1989–1991 budget on those additional funds being available at the end of the 1987–1989 biennium. The 1989 Legislature did not require that allotted funds be restored, which it could have done through a specific appropriation bill in the 1989 legislative

session, but instead it apparently relied upon availability of those funds in setting appropriations for the 1989–1991 biennium.[3]

We need not determine whether Rayl, as director of the budget, had discretionary power under Section 54–44.1–12, N.D.C.C., to restore the funds. The relevant question in a mandamus proceeding is whether he had an absolute, nondiscretionary duty to restore the funds. The School Districts have failed to carry their burden of demonstrating a clear legal duty to restore the funds. Accordingly, we conclude that the trial court did not abuse its discretion when it refused to issue a writ of mandamus.

## IV. CONSTITUTIONALITY

The School Districts assert that Section 54–44.1–12, N.D.C.C., is an unconstitutional delegation of the Legislature's authority under Article X, Section 12, N.D. Const., to appropriate state funds.

All legislative enactments are imbued with a strong presumption of constitutionality, and the presumption is conclusive unless it is clearly shown that the statute contravenes the state or federal constitution. *State v. Hegg*, 410 N.W.2d 152, 154 (N.D.1987); *Richter v. Jones*, 378 N.W.2d 209, 211 (N.D.1985). Any doubt must be resolved in favor of the constitutionality of the statute. *Verry v. Trenbeath*, 148 N.W.2d 567, 571 (N.D.1967).

We have recently noted a gradual change in our approach to the nondelegation doctrine, and we now follow the modern view which recognizes that, in a complex area, it may be necessary and appropriate to delegate in broad and general terms, as long as there are adequate standards and procedural safeguards. *Lawrence v. Lawrence*, 432 N.W.2d 897, 897–898 (N.D.1988). In *Trinity Medical Center v. North Dakota Board of Nursing*, 399 N.W.2d 835 (N.D. 1987), we traced the historical underpinnings of the doctrine and reviewed at length its evolution in this state. We concluded that a more relaxed application of the nondelegation doctrine was "necessitated by the complexities of the society in which we live." *Trinity Medical Center, supra*, 399 N.W.2d at 848.

It is within this context that we apply the traditional standards of the doctrine. In *County of Stutsman v. State Historical Society*, 371 N.W.2d 321, 327 (N.D.1985), we summarized those standards:

"Unless expressly authorized by the State Constitution, the Legislature may not delegate its purely legislative powers to any other body. *Ralston Purina Company v. Hagemeister*, 188 N.W.2d 405 (N.D.1971). However, the Legislature may delegate powers which are not exclusively legislative and which the Legislature cannot conveniently do because of the detailed nature. Simply because the Legislature *may* have exercised a power does not mean that it *must* exercise that power. In *Ralston Purina Company, supra*, we pointed out that the true distinction between a delegable and non-delegable power was whether the power granted gives the authority to make a law or whether that power pertains only to the execution of a law which was enacted by the Legislature. The power to ascertain certain facts which will bring the provisions of a law into operation by its own terms is not an unconstitutional delegation of legislative powers. *Ferch v. Housing Authority of Cass County*, 79 N.D. 764, 59 N.W.2d

---

3. In an affidavit dated August 25, 1989, after the 1989 legislative session had ended, Rayl explained:

"OMB prepared the executive budget, and presented it to the Legislature, with the assumption that the 2% allotment would not be restored. To my knowledge, the issue whether to unallot the 2% was never discussed by the Legislature, individual state agencies, or special interest groups during the 1989 Session. In fact, when the March, 1989, forecast indicated that general fund revenues would be approximately $17.2 million greater than previously estimated in November, 1988, and $22.6 million greater than the drought forecast in July, 1988, the Legislature relied on the additional revenue to fund the 1989–91 biennium's appropriations and no consideration was given to utilizing the additional revenue to unallot the 2% reduction for the purpose of expenditure during the 1987–89 biennium. No agency nor interest group suggested that the additional revenue should be used for the purpose of 'unallotment.' "

849 (1953). However, the law must set forth reasonably clear guidelines to enable the appropriate body to ascertain the facts. *Ralston v. Purina Co., supra."*

Delegation of various governmental functions has long been recognized as a virtual necessity:

" ' "The Legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside of the halls of legislation." ' [*Picton v. Cass County*, 13 N.D. 242] 100 N.W. [711] at 713 [ (1904) ] (quoting *Locke's Appeal*, 72 Pa. 491, 13 Am.Rep. 716)."

*Trinity Medical Center, supra,* 399 N.W.2d at 839 (quoting *Picton v. Cass County*, 13 N.D. 242, 100 N.W. 711 (1904)).

■ Section 54–44.1–12, N.D.C.C., by its terms requires the director of the budget to determine that one or more of four enumerated factors is present before an allotment reducing an appropriation may be made. In this regard, this case is substantially similar to cases such as *State ex rel. Kaufman v. Davis*, 59 N.D. 191, 229 N.W. 105 (1930), and *Ralston Purina Co. v. Hagemeister*, 188 N.W.2d 405 (N.D.1971), in which we upheld the constitutionality of statutes which set outside limits for an appropriation and for licensing fees, respectively, and simultaneously granted to an agency limited authority to vary the specific amounts expended or charged within those outside limits. *See Trinity Medical Center, supra* (summarizing these and other similar cases). The Legislature has not given the director of the budget power to make a law, but only the authority to execute the law within the parameters established by the Legislature.

We conclude that the School Districts have failed to demonstrate that Section 54–44.1–12, N.D.C.C., constitutes an unconstitutional delegation of legislative authority.

We have reviewed the remaining issues raised by the parties and find them to be without merit. The order of the district court is affirmed.

GIERKE, LEVINE and MESCHKE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached in the majority opinion and I agree with the rationale contained therein. But I write separately to sound a note of caution concerning the delegation of legislative authority. I am aware that the "modern view" recognizes that in a "complex area" it may be necessary and appropriate to delegate legislative authority in broad and general terms if that delegation is accompanied by adequate standards and procedural safeguards. In our increasingly intricate society, resulting in consistently greater involvement of government, that may be inevitable, particularly in states such as North Dakota which do not desire a full-time professional legislative branch of government. Nevertheless, there appears to me to be some distinction between those regulatory and administrative functions of the Legislature which are freely delegated by that body and the more basic role of appropriating the funds wherewith those delegated functions are to be performed. I suggest those more fundamental roles demand closer review.

There should be little doubt that one of the more basic roles of the legislative branch—if not the most fundamental role because of the repetitiveness with which it must be performed—is that of "the power of the purse," *i.e.,* the appropriation of funds for the operation of the entire government.[1] N.D. Const. art. IV, §§ 35

---

1. Cases such as *State ex rel. Kaufman v. Davis,* 59 N.D. 191, 229 N.W. 105 (1930), and *Ralston Purina Co. v. Hagemeister,* 188 N.W.2d 405 (N.D. 1971), involved the taxing and appropriation authority of the Legislative Assembly, but did not involve an underlying purpose, such as the

and 36 [specifying the manner and time for appropriation bills] and N.D. Const. art. X, § 12 [public moneys to be disbursed only pursuant to legislative appropriation]. This is particularly true where the object of the appropriation is for a purpose ordained by the Constitution. N.D. Const. art. VIII, § 1 [Legislative Assembly must make provision for establishment and maintenance of a system of public schools]. *State ex rel. Walker v. Link*, 232 N.W.2d 823 (N.D. 1975) [Legislature cannot refuse to fund a constitutionally mandated function].

Section 54–44.1–12, NDCC, which authorizes the director of the budget to exercise control over the execution of the budget affecting the departments and agencies of state government—but not the separate legislative and judicial branches thereof—does, as the majority observes, set forth circumstances for reducing appropriations. Subsection 1 of that section sets forth the first standard, *i.e.*, that the "moneys and estimated revenues in a specific fund from which the appropriation is made are insufficient to meet all legislative appropriations from the fund." Although this is a reason for reducing the appropriation, I am less convinced that it sets forth an objective standard for the director of the budget to follow. Fluctuations in revenue estimates over the more than two-year period from the time of the appropriation by the Legislative Assembly to the end of the biennium for which the appropriations were made should not be unexpected in, for example, a time of drouth and recession. But § 54–44.1–12 does little more than recognize that possibility. It is important that the Legislative Assembly not delegate to the director of the budget the authority to substitute that officer's judgment for the judgment of the Assembly. It is equally important not to thwart the Assembly's intent [*see* subsection 3 of § 54–44.1–12, NDCC]. Provisions which would, for example, establish the time at which the comparison of income estimates with actual revenues is to be made; describe the procedure to be used in predicting income; require the budget director to restore an allotment or a portion thereof, if the estimates upon which the director relied changed; or prescribe a system whereby the anticipated revenue at a specified date will determine whether or not a reduction is to be made, might provide better objective standards by which to delegate to the director of the budget the authority to reduce appropriations.

I believe the present statute is so broad and vague as to be alarmingly close to the edge of what is a legally acceptable delegation of legislative authority. The director of the budget is authorized to reduce appropriations if the estimated revenues will be insufficient to meet all legislative appropriations from a particular fund [in this case the general fund, which is the source of funds for a substantial portion of the fundamental activities of state government] and in so doing the reductions must be uniform for all departments and agencies that receive moneys from that fund. But other than those restrictions there are no standards by which the director is guided as to the extent of the reductions or the obligation to restore those reductions if revenue estimates improve. Perhaps most importantly, there are few, if any, procedural safeguards whereby the actions of the director may be questioned by those who disagree with the predicate for those actions. I am concerned the majority opinion will be relied upon to expand the delegation of legislative authority in this troublesome area of appropriations. I suggest that while affirming the denial of the writ of mandamus in this instance, we ought to sound a warning that the current statute contains legal pitfalls which could result in a contrary conclusion in other circumstances.

LEVINE, J., concurs.

maintenance of elementary and secondary education in the State.